ENOCH BERESFORD, as Administrator of the Estate of James Graham, Deceased, Appellant, v. THE AMERICAN COAL COMPANY, Appellee.

**Administrator's bond:** COLLATERAL ATTACK. An objection to an administrator's bond, which does not go to the jurisdiction of the court making the appointment, cannot be collaterally raised in an action brought by the administrator.

**Contributory negligence:** ASSUMPTION OF RISK. In an action for the death of plaintiff's intestate in a mine accident, neither contributory negligence nor assumption of risk by plaintiff are shown.

**Negligence:** LIABILITY OF MASTER FOR ACT OF EMPLOYE. An employe who is entrusted with the performance of a duty which the law enjoins upon the master, is, as to such service, a vice principal and his negligence is the master's negligence. Under this rule the owner of a coal mine is responsible for the death of an employe, caused by the negligence of a superintendent in sending away the engineer and himself attempting to operate the engine in lifting the cage carrying the employes from the pit to the surface.

**Same.** Under Code, section 2849, the act of a mine superintendent, who was not a competent engineer, in attempting to operate the engine causing the death of an employe, was negligence for which the owner of the mine was liable.

*Appeal from Mahaska District Court.*— HON. JOHN T. SCOTT, Judge.

FRIDAY, MARCH 18, 1904.

ACTION to recover damages on account of the death of plaintiff's intestate. Judgment for defendant upon a directed verdict, and the plaintiff appeals.—*Reversed.*

*Dan Davis* and *H. W. Gleason,* for appellant.

*Ryan, Ryan & Ryan* and *L. C. Blanchard,* for appellee.

WEAVER, J.— From the concessions made in the pleadings and from the evidence given on the trial the jury would have been justified in finding the following facts: The defendant corporation owned and operated certain coal mines in Mahaska county, in one of which James Graham was employed as a miner. Ingress to and egress from the mine were through a shaft about 100 feet in depth, in which a hoist or cage was operated by steam power. This apparatus was so constructed that in hoisting coal from the mine the cage was lifted to a height of 30 feet above the surface of the ground, where it was inverted or dumped by an automatic tipple, throwing the coal upon screens sloping down to cars standing upon a railway siding to receive it. In hoisting men it was the duty and custom of the engineer to stop the cage at the surface or exit from the shaft, and permit them to get out; otherwise, if carried on up to the tipple, they were liable to be thrown out, and receive serious injury. One James Wilson was superintendent, manager, or boss in the immediate charge or supervision of the mine, with power to employ and discharge the workmen and to direct the movement and labor of all persons employed in and about the mine, including the men in charge of the engine. The inference may be drawn from some of the testimony that there was a general manager or superintendent of the several mines operated by the defendant, who was Wilson's superior in authority; but it is quite clear that the latter was in full control of the practical daily operation of this particular mine or shaft. On the day in question Graham, with others, at the foot of the shaft, got upon the cage to be hoisted to the surface, and gave the proper signal to the engineer for that purpose. About this time Wilson sent the engineer away from the engine for the purpose of oiling the fans, and undertook himself to operate the hoist, well knowing that he was without the requisite experience and skill for the proper performance of that duty. By reason of his negligence and his incompetency to perform such

work the cage was hoisted past the landing at the surface
to the tipple, where it·was dumped.   Graham's companions
were thrown upon the screen, but he, failing to strike the
screen, fell to the bottom of the shaft, and was killed.   At
the close of the plaintiff's case the defendant, without offer-
ing any testimony, moved for a directed verdict in its favor
on numerous grounds, which may be grouped as follows:
(1) Because at the date of the commencement of this action
plaintiff was not the duly appointed administrator of the
estate of James Graham, and was without legal capacity to
bring suit as such.   (2) Because this action is barred by the
statute of limitation.   (3) Because no negligence of the de-
fendant is shown.   Defendant is not liable for the unau-
thorized act of Wilson in assuming to act as engineer.   Wil-
son was a mere volunteer, acting under no order, and with-
out authority.   (4) Because the negligence, if any, was
that of Graham's co-employé.   (5) Graham, by his own
negligence, contributed to his injury, and furthermore, he
had assumed the risk of such injury.

Error is assigned upon the ruling of the trial court in
sustaining this motion, and it becomes necessary for us to
consider each of the grounds upon which it is based.

I.   The objection made to the legal capacity of the plain-
tiff to maintain the action is not well taken.   It is based solely
upon the alleged fact that the bond given by plaintiff as ad-
1. ADMINISTRA-     ministrator is signed by a surety who. is a
TOR'S BOND:     practicing ·attorney, and therefore disqualified
collateral
attack.     by statute to be received as a surety in such
undertaking.   Code, section 385.   The question thus pre-
sented cannot be considered in a collateral proceeding.
Plaintiff held and offered in evidence his letters of authority
issued in due form by the proper court in probate, and it
must be presumed that he had made such showing and had
given such bond as that court had adjudged sufficient in the
premises.   It is true, the original appointment, under our
statute, may have been made by the clerk, and not by the

court in term; but the act and judgment of the clerk in such case stands as the act and judgment of the court, unless proper and timely exception is taken thereto in that tribunal. Code, sections 250, 251. Any person interested may appear in the probate proceeding and contest the appointment, or may in the same manner have an improper appointment revoked; but to allow every person who may be sued by an administrator to go behind the letters of authority and object to the bond given, or to plead any other defect which does not go to the jurisdiction of the court making the appointment, would be to involve litigation in a hopeless confusion of collateral issues. *Leonard v. Columbia,* 84 N. Y. 48 (38 Am. Rep. 491); *Kelly v. West,* 80 N. Y. 141; *Comstock v. Crawford,* 3 Wall. 396 (18 L. Ed. 34); *Simmons v. Saul,* 138 U. S. 452 (11 Sup. Ct. 369, 34 L. Ed. 1054); *Reinach v. R. R.* (C. C.), 58 Fed. 43; *Abbott v. Coburn,* 28 Vt. 663 (67 Am. Dec. 735). And see cases cited 11 Am. & Eng. Ency. Law (2d Ed.) 785, note 6. An objection to the sufficiency of the administrator's bond does not raise a jurisdictional question. The authority of the court to appoint does not rest upon the bond. That is a question going only to the manner of qualifying under an appointment already made, and not to the validity of the appointment. Even the entire absence of bond and oath of office has been held insufficient to sustain such attack. *Gallagher v. Holland,* 20 Nev. 164 (18 Pac. Rep. 834); *Ryan v. American,* 96 Ga. 322 (23 S. E. Rep. 411); *Hine v. Hussey,* 45 Ala. 496. See, also, *Irwin v. Scriber,* 18 Cal. 499; *Simmons v. Saul, supra; Savage v. Benham,* 17 Ala. 119; *Ray v. Doughty,* 4 Blackf. 115.

The cases cited by appellee from this court are not in point. *Pickering v. Weiting,* 47 Iowa, 242, decides no more than that the time for filing claims by creditors of one who dies testate dates from the appointment of the executor under the will, and not from the appointment of a temporary administrator pending the probate of the will. In

*Cuppy v. Coffman,* 82 Iowa, 214, we have a case where, pending a suit brought by the administrator, one of his sureties was released, and, the administrator failing to file a new bond, his letters were revoked, and the action dismissed. He thereupon obtained a new appointment, and appeal from the order of dismissal, but the court held that, not having appealed from the order revoking his appointment, it would be presumed he was removed for good cause, and the order of dismissal would therefore not be reviewed. In *Valley Bank v. Garrettson,* 104 Iowa, 655, the only surety upon a bond given for an appeal from the judgment of a justice of the peace, being a practicing attorney, we affirmed the judgment of the district court dismissing the appeal. That case is easily distinguishable from the one at bar. The bond upon appeal from the judgment of a justice of the peace is jurisdictional. The statute so provides. Code, section 4552. Without it no appeal is perfected, and the district court acquires no authority to try the case. Moreover, none of these cases involve the question of collateral attack. As having more or less bearing in support of our conclusion, see *Lees v. Wetmore,* 58 Iowa, 177; *Murphy v. Creighton,* 45 Iowa, 179; *McCandless v. Hazen,* 98 Iowa, 321; *Metropolitan Bank v. Com. Bank,* 104 Iowa, 682; *Seery v. Murray,* 107 Iowa, 384.

The further objection raised by the motion to direct a verdict that the right of action is barred by the statute of limitations is grounded upon the supposed effect of the alleged failure of plaintiff to file a proper bond within two years after the death of Graham; but as we hold the defect, if any, in the bond is unavailing to the defendant, the plea of the statute falls with it. Objection is also made by the appellee to the appellant's assignments of error, but we think them sufficiently specific.

II. The record presents no ground for holding as a matter of law that Graham was guilty of contributory negligence, or had assumed the risk of such accident. On the contrary,

if the undisputed evidence is to be believed, both of these
**2. CONTRIBUTORY** propositions are so clearly negatived that a ver-
**NEGLIGENCE:** dict to the contrary could not be upheld.  Gra-
**assumption**
**of risk.** ham was in a place where he had a right to be
— a place provided for him by the defendant.  He had no
control over the power which lifted the cage.  He was
powerless to stop its movement or to escape from the peril
by which, without fault of his own, his life was threatened.
Counsel for appellee do not suggest in what manner the de-
ceased failed to exercise reasonable care for his own safety,
nor do we think such a contention can fairly be made.
Neither is there any reasonable theory upon which we can
say there was an assumption of the risk.  Indeed, there is
no plea of such assumption of any risks created by the negli-
gence of the defendant, and, if pleaded, plaintiff was not
required to negative such defense.  *Sankey v. R. R.,* 118
Iowa, 39; *Shebek v. Cracker Co.,* 120 Iowa, 414; *Nicho-
laus v. R. R.,* 90 Iowa, 85.  As to risks naturally incident
to the employment, they certainly do not include the risk of
negligence in the care and operation of the mine by the per-
son to whom that duty had been intrusted by the defendant.
On the contrary, as we shall hereafter note, Graham had the
right to assume that defendant and those to whom the man-
agement and control of the work was intrusted would fur-
nish him a reasonably safe means of entering and leaving
the mine, and would not unnecessarily expose him to any
danger other than those which are incident to or inseparable
from such work when carried on in a reasonably safe and
prudent manner.  *Ill. Steel Co. v. McFadden,* 196 Ill. 344
(63 N. E. Rep. 671, 89 Am. St. Rep. 319).

III.   Is there any evidence tending to show negligence
on part of the defendant?  Here is presented the one debat-
able question in the case.  That Graham's death was caused
**3. NEGLIGENCE:** by the negligence or recklessness of some one is
**liability of**
**master for** too clear for argument.  A cage loaded with
**act of**
**employe.** men was to be hoisted by power over which

they had no control.   They had the legal right to assume
that this power was in the hands of an experienced and com-
petent person, as provided by the statute, to say nothing of
the common-law duty of their employer.   Instead of being
allowed to land in safety at the mouth of the mine, they
were thrust upward into violent contact with the tipple, and
thrown out like so many lumps of coal.   No claim or sug-
gestion is made that, in spite of reasonable care and skill,
the machinery suddenly became uncontrollable, or that the
engineer was disabled by accident or sudden illness, or that
the men on the cage in any manner interfered with the
operation of the hoist.   On the contrary, it clearly appears
that the accident is primarily chargeable to the negligent
act of Wilson; and, if in said act he may properly be found
to have been the representative or vice principal of the de-
fendant, then his negligence was the defendant's negligence.

The general proposition that, in the absence of statute to
the contrary, an employer is not liable to a servant for injuries
resulting to the latter from the negligence of a fellow
servant, whatever we may think of the reason or justice of
the rule as an original question, is now too firmly established
to require discussion or citation of authorities. It is equally
well established that in certain positions and under certain
circumstances an agent or employe becomes such a direct
representative of his employer that the negligence of the
former is imputable to the latter, and in such case the ex-
emption of the employer from liability under the general
rule above stated does not obtain.   These abstract proposi-
tions are everywhere conceded, but in their practical appli-
cation to concrete cases much trouble has been experienced.
Great effort has been made to reduce the principle to some
brief statement which shall serve as a touchstone for the
trial of all cases, but thus far without conspicuous success.
In this, as in other classes of litigation, there are many bor-
der line cases where the usual tests fail to make clear the
very right of the controversy; and many others where the

increasing complexity of organization in business employ-
ing human labor renders it no easy matter to bring them
within the operation of recognized general rules.  Without
any suggestion of unfavorable criticism, it may be said that
some courts have exhibited a manifest tendency to so extend
the rule that it is only in rare and extreme instances that a
servant in our great labor-employing enterprises is permitted
to recover damages from the master for injuries incurred in
his service; while other courts holding to the same general
statement of the doctrine have tended to more liberality in
its application, thus avoiding to some extent the injustice
and hardship which not infrequently follow the more rigid
and technical holdings.

The question as to when a servant or agent may be con-
sidered the vice principal or direct representative of the em-
ployer has been variously answered.  In some cases it has
been held that a superior servant is, by virtue of his rank,
a vice principal as to an inferior servant of the same em-
ployer; in others his representative character is made to
depend on his authority to employ and discharge his subor-
dinates; according to others, to be a vice principal, the su-
perior servant must have the entire charge and control of a
distinct department of the master's business; and in still
others that relation is made to turn upon the character of the
act or service concerning which negligence is charged, rather
than upon the rank of the employe by whom such act is done
or such service is performed.  This latter phase or state-
ment of the rule is supported by the preponderance of cases,
and has had the express adherence of this court.  *Newbury
v. Mfg. Co.,* 100 Iowa, 441; *McQueeny v. R. R.,* 120 Iowa,
522.  The substance of the doctrine thus approved is that
any employe who is intrusted with the performance of a
duty which the law enjoins as a personal duty upon the mas-
ter is, as to such service, the vice principal of the master,
and in such service his negligence is the master's negligence.
This conception of the rule has the advantage over some

others, in that while, under some circumstances, more diffi-
cult of application, it is less artificial and arbitrary. For
other statements of the same rule, see *Curley v. Hoff,* 62
N. J. Law, 758 (42 Atl. Rep. 731); *Ross v Walker,* 139
Pa. 42 (21 Atl. Rep. 157, 159, 23 Am. St. Rep. 160);
*Lafayette B. Co. v. Olsen,* 108 Fed. Rep. 335 (47
C. C. A. 367, 54 L. R. A. 33). But in applying this rule
the word "rank" is not used as the equivalent of "author-
ity"; for while it is true that mere rank of a superior
servant will not make him a vice principal the authority of
such servant in respect to the act alleged to be negligent is at
all times a matter of prime importance. If he has no au-
thority from the master, then in the very nature of things
he cannot be a vice principal. If he has authority, whether
express or implied, his vice principalship depends upon
whether the scope of such authority includes attention to or
performance of any of the non-delegable duties of the mas-
ter; and, if so, then whether the alleged negligent act is
referable to any of those duties. Illustrative of the funda-
mental inquiry into the scope of authority vested in the fore-
man, boss, superintendent, or superior servant charged as a
vice principal, see *Hathaway v. Des Moines,* 97 Iowa, 333;
*Foley v. Railway,* 64 Iowa, 644; *Baldwin v. R. R.,* 68 Iowa,
41; *Wilson v. Dunreath,* 77 Iowa, 429; *Newbury v. Mfg.
Co., supra; Swift v. Bleise,* 63 Neb. 739 (89 N. W. Rep.
310, 57 L. R. A. 147); *Island Coal Co. v. Swaggerty,* 159
Ind. Sup. 664 (65 N. E. Rep. 1026). The duties for which
the master cannot escape liability by delegating their per-
formance to an officer, agent, or servant need not be stated
here with any attempt at completeness. So far as they are
directly or indirectly involved in the present controversy,
they may be said to include the obligation to furnish the
servant a reasonably safe place to work; to exercise reason-
able care to avoid injury to the servant while engaged in his
service; to exercise like care to furnish and maintain suit-
able and safe machinery, tools, and appliances with and

about which the servant is required to work; to give the servant timely warning of dangers which are known or ought to be known to the master, but are neither known nor patent to the servant; to supply a sufficient number of competent workmen for the safe conduct of the particular labor in which the servant is engaged, and to exercise such direction, control, and supervision over the work as may be required to carry on the same with reasonable safety to all employed therein. Any failure in respect to these duties, whether by the master in person or by any employe to whom their performance is committed, is negligence for which the master may be held liable. This negligence may consist in matters of omission or commission, which latter will include the giving of an improper order. *Hankins v. R. R.*, 142 N. Y. 416 (37 N. E. Rep. 466, 25 L. R. A. 396, 40 Am. St. Rep. 616); *Dowling v. Allen*, 74 Mo. 13 (41 Am. Rep. 298); *Con. Coal Co. v. Wambacher*, 134 Ill. 57 (24 N. E. Rep. 627); *Newbury v. Mfg. Co., supra.*

In few, if any, employments do the circumstances call for a more rigorous observance of these rules than in coal mining. Even when conducted with all reasonable skill and caution, it is a work attended with many dangers. Of those dangers which are naturally incident to the business, the miner takes the risk, but in doing this he is entitled to rely upon the proper observance by the operator or owner of the duties which the law imposes upon him for the protection of the life and limb of his employes. If the business be very extensive, or if the operator be a corporation, the actual or direct performance of these duties must of necessity be intrusted to agents or employes; and these, while so engaged, are not "fellow servants" with the miner. In the case before us it is sufficiently indicated that Wilson was the direct representative of the defendant company. Whatever may have been the general authority of the superintendent, Wilson was in immediate command of the operation of the mine. In the language of the witnesses, he "was the boss on top

and at the bottom," by which we may understand he was something more than a mere " pit boss," and had the general supervision and oversight of the mine and its operatives. That even a pit boss may be a vice principal, see *Wahlquist v. Maple Grove, etc., Co.,* 116 Iowa, 720; *Island Coal Co. v. Swaggerty,* 159 Ind. Sup. 664 (65 N. E. Rep. 1026); *Wellston v. Smith,* 65 Ohio St. 70 (61 N. E. Rep. 143, 55 L. R. A. 99, 87 Am. St. Rep. 547); *Cunningham v. R. R.,* 4 Utah, 206 (7 Pac. Rep. 795); *Con. Coal Co. v. Wombacher,* 134 Ill. 57 (24 N. E. Rep. 627). In the very nature of things, many of the duties imposed upon the master cannot be performed by him at a distance, or postponed to a convenient time in the future. A coal mine or other large enterprise employing many hands in a business attended with ever-present dangers is something which cannot be left to run itself without the immediate supervision and control of a responsible representative of the proprietor, and the latter be held guiltless of negligence if therefrom accident and injury result to the employes. Under many circumstances the duties of the master relate to the very time and place where the work is done, or depend upon contingencies unexpectedly arising and demanding immediate attention. Assuming that the defendant intended to observe its duty in this respect, and had a representative on the ground charged with its performance, the only person to whom the evidence points as bearing such responsibility is Wilson. We regard it quite certain, at least, that the evidence would have sustained a finding of the jury that in the immediate operation and control of the mine, direction of the work, and command of the laborers Wilson was the vice principal and responsible agent of the corporation. If upon the showing of authority made in this case it appeared that he had ordered Graham to work in a place which he knew to be more than ordinarily dangerous, and failed to apprise him of the risk thus incurred, and Graham had thereby met his death without fault on his part, the liability of the defend-

ant would not be doubted. *Wahlquist v. Maple Grove, etc., Co., supra.* If, then, in negligently ordering a miner to work in a place he knew to be dangerous, he would have been held to speak as and for the master, by what rule or principle is he less the master's representative when, in the discharge of his general supervisory power, he gives a negligent order, or does a negligent act, which brings injury or death to a servant?

There is some question under the evidence whether the engineer was employed or subject to discharge by Wilson, but, whatever may be the truth in that respect, enough is shown concerning Wilson's authority to justify us in the assumption that, had the engineer become suddenly disabled in the midst of a day's work, it was within the province of the former to direct some competent person, if such were at hand, to take the vacant position, temporarily at least, and prevent instant paralysis in the operation of the mine. If, in such emergency, he had knowingly placed an inexperienced, reckless, or incompetent man in charge of the engine, and disaster had resulted, his negligence would clearly have been imputable to defendant. If this be so, we think it follows that when this vice principal by his own act (and in violation of the statute, as we shall hereafter see) made a temporary vacancy in the engineer's position, and with knowledge of his own incompetency for the work undertook himself to operate the engine, there is no sound reason for saying that in so doing he ceased to represent his employer. It is no answer to say that in so doing Wilson was a mere volunteer, or acted without direction of the defendant. The act of a servant in representative authority does not cease to be the act of the master simply because it is an abuse of such authority. It is due to the fact that such abuses do occur, and the necessity of effective redress, that the doctrine of imputed liability has been devised. No employer expects or directs his agent or vice principal to be negligent or reckless in the discharge of his duties, and if

we were to hold that the instant such agent ceases to exercise reasonable care, or is guilty of recklessness in such employment, he ceases to represent his employer, the latter could never be held liable for an injury to a servant, even under the most aggravated circumstances. As having a more or less direct bearing in support of our conclusion upon this branch of the case, see *Island Coal Co. v. Swaggerty*, 159 Ind. Sup. 664 (65 N. E. Rep. 1026); *Swift v. Bleise*, 63 Neb. 739 (89 N. W. Rep. 310, 57 L. R. A. 147); *Heckman v. Mackey* (C. C.), 35 Fed. Rep. 353; *Ill. Steel Co. v. McFadden*, 196 Ill. 344 (63 N. E. Rep. 671, 89 Am. St. Rep. 319); *C. & N. W. R. R. v. Bayfield*, 37 Mich. 212; *Dayharsh v. R. R.*, 103 Mo. 570 (15 S. W. Rep. 554, 23 Am. St. Rep. 900); *Sweeney v. R. R.*, 84 Tex. 433 (19 S. W. Rep. 555, 31 Am. St. Rep. 71); *Denver R. R. v. Driscoll*, 12 Colo. 520 (21 Pac. Rep. 708, 13 Am. St. Rep. 243); *Cleveland R. R. v. Keary*, 3 Ohio St. 204; *Westville Co. v. Schwartz*, 177 Ill. 272 (52 N. E. Rep. 276); *Taylor v. R. R.*, 121 Ind. 124 (22 N. E. Rep. 876, 6 L. R. A. 584, 16 Am. St. Rep. 372); *Flike v. R. R.*, 53 N. Y. 549 (13 Am. Rep. 545); *Brickner v. R. R.*, 2 Lans. 506; *Ross v. Shanley*, 185 Ill. 390 (56 N. E. Rep. 1105); *Baldwin v. R. R.*, 68 Iowa, 41; *Baldwin v. Ry. Co.*, 75 Iowa, 299; *Shumway v. Walworth*, 98 Mich. 411 (57 N. W. Rep. 251); *Ryan v. Bagaley*, 50 Mich. 179 (15 N. W. Rep. 72, 45 Am. Rep. 35); *Brothers v. Carter*, 52 Mo. 373 (14 Am. Rep. 424); *Borgerson v. Cook* (Minn.), 97 N. W. Rep. 735.

IV. The statute regulating the operation of coal mines provides (Code, section 2489) " that the owner or persons in charge of any mine * * * shall not knowingly place in charge of any engine used in or about the operation of the mine any but experienced, competent and sober engineers who shall not allow any one but those designated for that purpose to handle or in any way interfere with it or any part of the machinery." Possibly this provision does not greatly extend the scope of the

4. SAME.

common-law duties of a mine operator, but it serves at least to make clear certain specific obligations which cannot be neglected without incurring liability for the consequences. As proprietor it was defendant's duty to use all reasonable care to employ an engineer with the statutory qualifications, and for the purposes of this appeal we may assume that the engineer in charge was a competent and proper person for the position. It was Wilson's duty as mine boss or manager having the immediate superintendence of the mine and its operation to see that the command of the statute in reference to the care and operation of the engine was obeyed, and, if he neglected that duty, or by his active interposition caused the responsible engineer to leave his post, and permit an incompetent and unauthorized person to handle the engine, thereby causing accident and injury to other servants rightfully in or about the mine, his act and his neglect were the act and neglect of the defendant, his employer. It is not necessary for us in this case to consider whether the engineer can under any circumstances be considered a vice principal. If we regard him as a fellow servant only, and say that, so far as his negligence was a cause of the accident, no right of action arises against the defendant, that defense will be unavailable if the negligent act or order of the defendant or of its vice principal combined with the negligence of the engineer to produce the injury to Graham. See statement of rule and authorities cited in *12 Am. & Eng. Ency. Law* (2d Ed.), p. 905, and note.

Other questions argued are such as are not likely to arise upon a retrial. For reasons stated there must be a new trial.

The judgment of the district court is therefore RE-VERSED.