ANNA HITCHCOCK, Admrx. of Estate of Wesley Hitchcock, Deceased, Appellee, v. ARCTIC CREAMERY COMPANY, Appellant.

**MASTER AND SERVANT:** Non-Employing Servant—Implied Au-
1, 4 thority in Emergency. An emergency, a pressing necessity, an unforeseen condition, rendering impossible, without farther assistance, the full performance of the master's specially assigned

work, may, of itself, arm the servant, to whom such work was assigned by the master, with implied authority to employ or accept assistance immediately and essentially necessary to fulfill the task assigned, and thereby clothe the one employed or assisting with the rights of a servant of the master, even though the one employing or accepting the service otherwise has no authority to employ anyone or accept any service on behalf of the master, and even though the one employed or assisting does so under such circumstances that he could recover no compensation therefor from the master.

PRINCIPLE APPLIED: Deceased was employed by defendant in its creamery to wash cans and do light work. On two occasions he had been found doing other work and was directed to quit and go to his own work. The defendant directed its engineer to install, as quickly as he could, an exhaust pipe from the engine in the basement through the floor of a large room above, where deceased worked. The engineer was in charge of the mechanical part of the plant. He was not told how to install the pipe because he knew how. The engineer spoke of getting help and the manager told him if he needed help to get one Wilcox, but did not tell him to get anyone else. The engineer testified he had no authority to employ anyone else without consulting the manager. Wilcox was secured. The engineer used his own judgment in installing the pipe. No one was superior in authority over the engineer in his department in the absence of the manager, and the manager when the pipe was installed was sick and not present. Heavily charged electrical wires, known to the engineer and his assistant but unknown to deceased, ran just beneath the floor. The engineer cut a hole in the floor twelve inches from these wires in order to run the pipe into the basement. Deceased was doing his usual work at this time. The engineer asked him to help move a vat in order to put the pipe through the floor. Three men, not including deceased, tried without success to raise the pipe and put it through the hole. The assistant engineer, without direction to anyone in particular, said: "Give us a lift, boys." The buttermaker and deceased both stood near. The engineer said he did not hear the remark of his assistant engineer. All five men, including deceased, then took hold of the pipe. The engineer testified he did not call deceased or give him any orders, but said: "We needed them and was glad to get their help. I saw them all working with the pipe." It required the combined efforts of all the men to get the pipe through the hole. In doing so the pipe hit the wires, cut through the insulation, the pipe was charged, and deceased was killed. *Held*, the deceased was the servant of the defendant, the engineer having implied authority to accept the services of deceased.

**MASTER AND SERVANT:** Negligence—"Fellow-Servant" and "Safe-Place-to-Work" Rules—Application of. The "fellow-servant" and "safe-place-to-work" rules are bottomed on diametrically opposite premises: the former, that the master should not be held for the negligence of a fellow-servant because he could not reasonably anticipate or guard against it; the latter, that the master should be held for negligent conditions known to him and which he could reasonably guard against.

> PRINCIPLE APPLIED: (See No. 1.) *Held,* the latter rule must be applied.

**MASTER AND SERVANT:** Safe Place to Work—Hidden Dangers— No Warning. The "safe-place-to-work" rule is violated by a failure of the master to warn the servant of known lurking and hidden dangers.

> PRINCIPLE APPLIED: (See No. 1.)

**MASTER AND SERVANT:** Vice Principal or Fellow-Servant?—Non-Delegable Duties. Whoever is in charge of the performance of a non-delegable duty of the master is a vice principal.

> PRINCIPLE APPLIED: (See No. 1.) *Held,* the engineer was a vice principal.

**WITNESSES:** Credibility of Statements—Rejection of Positive Assertions. The statement of a witness "I did not hear" is not necessarily conclusive on a jury though undisputed by oral testimony. The surrounding facts may show he did hear.

> PRINCIPLE APPLIED: (See No. 1.) *Held,* the jury might well find that the engineer did hear the call of his assistant for help, though testifying that he did not hear it.

*Appeal from Woodbury District Court.*—HON. DAVID MOULD, Judge.

FRIDAY, JANUARY. 25, 1915.

REHEARING DENIED SATURDAY, MAY 15, 1915.

ACTION to recover damages for personal injury resulting in the death of plaintiff's intestate. Defense, that deceased was a mere volunteer to whom the defendant owed no duty at the

time of the injury.   Judgment for the plaintiff.   Defendant appeals.—*Affirmed.*

*J. W. Hallam* and *Geo. W. Finch,* for appellee.

*Sears & Snyder,* for appellant.

GAYNOR, J.—This is an action brought by the administratrix of one Wesley Hitchcock to recover damages for injuries resulting in his death.

It appears that Wesley Hitchcock was employed by the defendant in its creamery at Sioux City for the purpose of washing cans, and other light work in connection with cleaning of cans and other utensils about the creamery.   At the time of the happening of the injury and death complained of, other employees, under the direction of one Richard Bates, the engineer who had been placed in charge of the work by the defendant company, were lowering an iron pipe through a hole in the floor of the creamery for the purpose of placing it in an upright position from the basement to the ceiling of the room in which they were working; that at said time, immediately beneath the floor of the room from which they were lowering the pipe, there were a number of electric wires, heavily charged with electricity; that while they were so doing, Wesley Hitchcock was called to their assistance, he being in the same room and near by, washing cans and then in the discharge of the duties incident to his employment; that upon such request, Wesley Hitchcock came to their assistance, and took hold of the pipe for the purpose of helping to lower it to the basement through the hole in the floor; that while they were in the act of lowering the pipe through the hole, it came in contact with the electric wires stretched beneath the floor, and the pipe thereby became heavily charged with electricity, and being communicated to Wesley Hitchcock, caused his death.

The negligence charged is in calling the said Wesley Hitchcock from his ordinary work, the work for which he

was employed, to undertake a more dangerous and hazardous task, without warning him or giving him, in any way, notice of the danger attending his act, and in failing to inform him of the presence or existence of the electric wires, of which he had no knowledge, and in failing to furnish him with a safe place in which to do the work, and in permitting him to work in the vicinity of dangerous and deadly wires, heavily charged with electricity, the location of which was fully known to the defendant, its managers, and other employees in charge of the work, or which they should have known in the exercise of reasonable care, and in failing to turn off the electric current from the wires in question while the work was being done, and in failing to turn off the electric current after they discovered that the pipe was being charged with electricity, and deceased was unable to extricate himself.

The defendant's answer sets up the defense of contributory negligence, the negligence of the fellow servant, assumed risk, and further alleges that the wires claimed to have been the cause of the injury were entirely foreign to the work done, and further alleges that Hitchcock was, at the time, a mere volunteer, in that he left the work he was hired to do without the knowledge or consent of his employer.

1, 4. MASTER AND SERVANT: non-employing servant: implied authority in emergency. Upon the issues thus presented, the cause was tried to a jury and a verdict returned for the plaintiff. Upon this verdict, a judgment was entered for the plaintiff, and from this defendant appeals and assigns as error:

1st. The undisputed evidence shows that in going to assist and in assisting, he was a mere volunteer; that it was outside of the scope of his employment; that he was not ordered or directed by the defendant, or anyone in authority for the defendant, to engage in the work in which he was engaged at the time of his injury; and that he went to it of his own volition, and without orders, and engaged in work foreign to his regular employment, as a volunteer.

2d. The evidence wholly fails to show that anyone in

authority, as a vice-principal, with authority to bind defendant, was in charge of the work, or gave any orders in connection with it, and shows without contradiction that the only person who was in charge of defendant's work and plant was not there; and there was no vice-principal in charge of the work, and that no one gave any orders, in any event, to the deceased, to engage in the work in which he was employed at the time he received his injury.

The question presented by these assignments of error we will dispose of first, and they present this question: Did the deceased, at the time of the injury, sustain such relationship to the defendant that, in the relationship, there was involved responsibility, on the part of the defendant, for injuries received by the deceased while so engaged?

We recognize the principle which has been well settled in the law, not only of this state, but in other jurisdictions, that the master has the primary right to determine who shall serve him in any particular capacity. The relation of master to a servant involves responsibility and risk, and this responsibility and risk cannot be imposed upon him by another, except with his authority or consent. This authority may be expressed or implied. A mere volunteer, as such, has no claim upon the master, based upon any relationship which creates any right in him to impose this responsibility and risk. He is a mere trespasser, an interloper, one to whom the master owes no duty except that active one which exists in all relationships in life, not to wantonly or wilfully injure him. The master cannot always act personally in relation to, and in the discharge of, his own business. He acts largely through others to whom he delegates authority and power to manage, control, direct and supervise both his business and his servants.

We find evidence in the record of the following facts: One Gear was manager of defendant's plant. Bates was its engineer. Hamm was his assistant. The duties assigned to Bates were to take care of the boilers, pumps, pipe lines, the

heater and the ice machine and everything of a mechanical nature to be taken care of and kept up. Bates talked with Gear two or three days before the pipe in question was ordered. Gear told him to get it, but there was no talk as to when it should be delivered. Bates spoke to Gear about getting help at the time they talked about putting the pipe in. Gear told him if he needed help, to get Charlie Wilcox. Bates was in charge of the job connected with the putting of the pipe through the floor. Gear was at home sick.

Bates testified: "I had charge of the machinery. Hamm was under my control. He was my assistant, and the only one I had anything to do with. I knew how to do the work. It was in my department. Three of us tried to put the pipe through, but could not. We needed help. The buttermaker and this other boy came. It was my judgment and direction to run it through the floor as we did. I saw them all working at the pipe. I felt a shock and let go. I tried to pry the lad (meaning Hitchcock) off, and told someone to pull the switch. I knew at the time there were electric wires under the floor, eight inches below and twelve inches north of the hole. I saw them when I made the hole. I did not turn off the switch. There was nothing to prevent my doing so. So far as I know, Hitchcock did not know of the wires. I cut the hole the way I saw fit. It was left to me; Mr. Gear gave me no instructions. I had no authority over anyone except Hamm."

Hugo Larch testified: "I worked for the Arctic Company when Wesley was hurt. His job was washing cans. At the time of the accident, they were putting in an exhaust pipe for the engine. Mr. Bates, the engineer, had charge of that work, and it was for his engine, the engine downstairs. I saw the hole that was cut through the floor. Should judge it was about a foot square."

Hamm testified: "I got my orders what to do from Mr. Bates, the engineer. Whatever he had to do, I helped him at it, and under his direction. I was assisting him to lower

the pipe when Hitchcock was hurt. Mr. Bates was direct-
ing the work. When we first tried to get it through the hole,
the hole was not large enough, and we laid the pipe on the
floor. It was Mr. Bates who cut the hole larger. I was his
assistant, and was acting under his direction in doing the
work. The pole struck the electric wire below. It cut through
the insulation and came in contact with the copper wire.
Both Mr. Bates and myself knew that the wires were there.
It was possible to have turned the switch before putting the
pole down, and I don't know any reason why it wasn't done.
I never saw Hitchcock in the basement where these wires
were before the accident. The putting down of the pole
was in connection with the engineering department which
was in charge of Mr. Bates. The putting down of this pipe
was no part of Hitchcock's work, nor of Wilcox's nor of
Kimberg's, but we needed all the help we had to get the
pipe through the floor.''

Bates further testified: ''Mr. Gear told me to do this
work. The pipe was ordered under his direction. Gear was
there when the pipe was delivered. This pipe was necessary
for carrying out the plans of my department. It was Hamm's
duty to help me if anything was done, and to do anything
I directed him in my department. Gear knew we were going
to lower the pipe that day. He went home sick. He wanted
it up as quick as we could get it done. No one gave me any
direction as to how the work should be done. It was in my
line, and I knew how to do it. I was head of that depart-
ment. No one was over me when Mr. Gear was gone. Three
of us could not raise the pole, it was too heavy. Then the
buttermaker and Hitchcock came. They were working to-
gether at the time, and we needed their help. It took all of
us to put it through the hole. My judgment was, that it was
best to run it through the hole into the basement, and it was
at my direction that it was done. The others followed my
direction. No one had anything to say about how the work
should be done but myself, and Mr. Hamm, my assistant.

Everything done in the engine department was done under my authority and direction, and I got my authority from Mr. Gear, the manager of the plant. The work we were doing was in my department, for the purpose of making it more effective and efficient in the running of the plant. I directed the work, and as to their help, was glad to get it. It was all done under my direction and nobody else. Gear left the work to me. That was my work for that day. They came at the time I was directing the work. No one had anything to do with lowering the pole but me. Whatever directions were necessary to do the work, I gave them.''

Harvey Hamm testified: ''I was assistant to Bates. I was helping lower the pipe. Bates cut the hole. Wilcox, Bates, Kimberg, Hitchcock were lowering the pipe at the time of the injury. Bates was directing the work. I do not know as anyone called Hitchcock to assist. The call was general. I said, 'Give us a lift, Boys.' They were all around there. They all helped. Bates was right there somewhere. I was assisting Bates, and acting under his direction as the others were. I saw where the pipe struck the wires and cut through the insulation. No one said anything about the wires during the work. I do not think that Bates called Hitchcock. If he came in response to anyone's call, it was in response to mine, 'Boys, lend me a hand.' Putting in the pipe was not Hitchcock's work. I usually obeyed Mr. Bates. The work was in charge of Bates and me. The pipe was a necessary part of the engineering department. It took all the help we had to get the pipe through.''

Bates further testified that Gear did not tell him to get anyone to assist except Wilcox, and said that he had no authority to employ anyone else except upon consulting Gear. He was asked this question: ''Was Wesley Hitchcock washing cans just before he took hold of the pipe?''

,A. ''No sir, emptying cream into the vat, and getting the lids off, and taking the samples out and testing for butter fat.''

Q. "Did the putting of the pipe down interfere with the cream man's work?"

A. "Yes sir, it did. I asked him to help me move the vat to let the pipe down."

Q. "And then you and Hamm and Wilcox took hold of the pipe?"

A. "Yes sir."

Q. "And these other two boys came up there of their own accord and tried to help?"

A. "Yes sir.'

Q. "They came up of their own accord and tried to help?"

A. "So far as I am concerned, I did not ask them. I did not call Hitchcock to help me or give him any orders of any kind or nature. He was there of his own accord, and took hold of the pipe without anybody's telling him. That is, so far as my knowledge goes. Hamm had nothing to say about what work should be done. He was simply employed like the rest of them. He was just supposed to do the work without authority to direct anybody. Everything was done under my authority and direction, and I got this from Gear, the manager of the plant. I gave no directions to any of the men as to how they should work in the putting down of the pipe, or what they should do. We all took hold together. I was the only one that had any authority to direct."

He was asked this question: "Did anyone give any directions there except you as to how the pipe should be lowered?"

A. "Not that I heard. What directions were necessary, I gave."

Bates further testified that he did not hear Hamm say, "Come, Boys, and give us a lift," or words to that effect. Heard no such remark made.

It appears that the building was one story high and a basement; that Hitchcock was employed on the street floor. The room in which the work was being done was about one hundred feet long east and west, and forty or fifty feet wide.

The hole where the pipe was put down was about twenty feet from the north side, and twenty-five feet from the west end.

Gear testified that he was manager of the Arctic Creamery Company at the time Hitchcock hired out to the company; that Hitchcock was hired to wash cans when cream was dumped into the vat, and to put them in their places; to take ice cream cans downstairs, put them on the shelf, and take them to the ice cream maker, "that was all and nothing else. I twice found him doing other things, and told him to quit and go back to his work. He had worked for the defendant about four or five weeks when he was injured."

Bates testified that he heard no call for help.

This is practically all the evidence bearing on the question here under consideration.

We are required to say, as a matter of law on this record, that Hitchcock at the time he was injured, was a mere volunteer, an interloper, and one to whom the defendant owed no duty, and for whose safety it was under no legal obligation to provide; that under the circumstances disclosed by this record, the relationship of master and servant did not exist between Hitchcock and the defendant at the time of his injury.

There is no question in this record but that the plant belonged to the defendant; that the work being done was for the use and benefit of the defendant; that it was in charge of Bates; that Bates was placed in charge of this work by the defendant; that he was directed to put this pipe down by the defendant; that the work was being done in the department to which Bates was assigned, and for the purpose of making that department more efficient and effective, and to make the running of the plant more efficient and effective; that everything done in that department was done under the authority and direction of Bates, and that he got his authority from the defendant; that the manner of doing the work was left entirely to Bates; that Hitchcock did assist him in this work, and this, with the knowledge and acquiescence of Bates; that whatever

directions were given as to the manner of doing the work in placing the pipe in position, were given by Bates. The accomplishment of the master's purpose was, by the master, placed under the charge of Bates. It was understood that he might need help. He did need help. His assistant called for help. Help came in the person of Hitchcock. Came with the knowledge of Bates. Hitchcock was assisting in work that the defendant desired to have done with the knowledge and consent and acquiescence of the party to whom the defendant had delegated the duty of doing the thing. It was out of the line of the duty imposed on Hitchcock by his original employment. He was called to a more hazardous work, without any notice or knowledge of the existence of the dangers that attended the work. He did not, therefore, assume any of the added hazard of this employment. He was not called to this work for any specified time, nor did he receive any additional compensation for the services rendered.

As said in *Maxson v. J. I. Case Co.*, 116 N. W. (Nebr.) 281, a case very similar in its facts to this: "It is claimed the relation of master and servant cannot be created except with the consent of the master, or by his express authority, or in special instances where a servant of the master, without express authority, is compelled from necessity or in some exigency to secure assistance. . . . It may be conceded that the master owes no duty as master to an officious intermeddler who volunteers his services without an invitation expressed or implied from the master. . . . Plaintiff may have been, and likely was, a volunteer in all he did before Thorpe arrived to take charge of the machine, although it was not from a spirit of meddling that he did what was done, but only to secure employment from the man seemingly in authority. Subsequent to Thorpe's statement that he wanted the plaintiff to remain and help, we think he came within the reasoning of Mr. Justice WEAVER in *Aga v. Harbach*, 127 Iowa 144:

" 'While the master owes no duty to the intermeddler who officiously interferes and undertakes to perform services without request or employment, and while some courts are inclined to put in the same category those who perform services at the request or order of a servant having no general authority to employ or discharge assistants, the general consensus of opinion seems to be that one who, in good faith, enters upon the master's work, at the request of a servant in apparent charge of such work, is not a trespasser, but assumes for the time being the relation of a servant. As such servant, he occupies the same relation and becomes subject to the same rules, including the operation of the fellow-servant rule, as those who are directly employed by the master, even though he may not be entitled to recover wages,' citing *Johnson v. Ashland Water Co.*, 71 Wis. 553; *Barstow v. Old Colony R. R. Co.*, 143 Mass. 535; *Georgia P. & R. Co. v. Propst*, 83 Ala. 518. . . .

"In the instant case, the master was a corporation resident in a distant state. The machinery was complex. The agent who had sole charge and control thereof came late in the forenoon of the day, and was hurrying to place it in condition for exhibition. Under those circumstances, it seems reasonable to believe a man seeking employment would have a right to rely on the expert's authority to employ assistance. It also seems reasonable to hold that the defendant corporation would be charged with notice of the fact that for the advancement of its own interests its expert in sole charge of the machinery at times ought to and might employ assistance."

In *Rummell v. Dilworth*, 111 Pa. 343 (2 Atl. 355), and *Anderson v. Guineau*, 9 Wash. 304 (37 Pac. 449), it was held that where a servant, with the knowledge or acquiescence of the master, employs a helper and pays him for his services, the one so employed is not a trespasser or volunteer, and while engaged in the master's work, the master is bound to exercise reasonable care for his safety.

In *Aga v. Harbach*, 127 Iowa 144, it appears that the

defendant was a manufacturer of furniture; that the plaintiff, who was an engineer, was in actual charge of the engine and engine róom, and while so engaged he attempted to adjust an incandescent electric lamp by which the room was lighted, and received an electric shock resulting in injury. The claim was that the plaintiff was not in the defendant's service, and the defendant owed him no duty to provide a safe place for work. The defense was, that the plaintiff was a mere volunteer, and that he was not in the service of the defendant at the time of the accident. It appears that Boehler was the engineer regularly employed to have charge of the engines; that Boehler was sick and invited or requested the plaintiff to take his place for a few days until he should be able to resume the work, and the plaintiff was so engaged at the time of the injury. Judge WEAVER, in passing upon the case, said: "It has been held that the servant has implied authority to engage such temporary service and that the substitute or assistant, if not in the law the employee of the master, is at least entitled to the same measure of protection as is the servant or agent upon whose request he rendered the assistance," citing authority.

In *Johnson v. Ashland Water Co.* (Wisconsin), 37 N. W. 823, it appears that Johnson and Furville made an oral contract with the defendant to dig a ditch in Water Street for a stipulated price per foot; that such ditch was a part of the works necessary for the construction of the water works the defendant was constructing under its charter; that plaintiff was employed by these parties and engaged in digging the ditch; that at the same time the defendant was engaged in the work of calking and laying iron pipes in the ditch which plaintiff was engaged in digging; that Pooley was defendant's superintendent, and had charge of the work of calking and laying iron pipes, and employed men to do such work; that Gansey and several other men were engaged in calking and laying pipes under the direction of Pooley; that when Pooley was not present, superintending

and directing the work, Gansey was authorized by Pooley to
direct the same and the men assisting; that while plaintiff was
engaged in digging the ditch and Gansey had charge of the
work of calking the iron pipes, Gansey. called the plaintiff
and directed him to raise one of the pipes upon which Gansey
was working; that the plaintiff responded, and while so en-
gaged, was injured. It was claimed by the defendant that
the facts do not entitle the plaintiff to recover; that he was a
volunteer in the work at the time he received his injury. The
court said: "Under the allegations of the complaint, the
plaintiff was engaged in the defendant's work at the request
of the man in charge of the work, and although it may be said
that his employment was for a mere temporary purpose, and
that the plaintiff was not expecting any pay for the work done,
and in that sense the employment was voluntary, still, being
in the defendant's employment at the request of its servant or
foreman, he was not a trespasser, and he was, for the time
being, the servant of the defendant and entitled to the same
protection as any other servant of the defendant."

In *Georgia Pac. Ry. Co. v. Propst, supra,* the plaintiff was
injured while in the employ of the defendant. The facts dis-
closed that the plaintiff had, at one time, served the defendant
in the capacity of brakeman, but at the time of the accident
and injury, he was not in that employment. He was then
serving as watchman at one of the stations on defendant's
road. His duties as watchman were local, confined to that place
and station. It appears that one of defendant's trains was
passing down the road with loaded freight; that the conductor
in charge of the train, feeling that he had not a sufficient
available force of brakemen to manage his train, either re-
quested or commanded the plaintiff to go with him and supply
the place of a sick brakeman. The plaintiff went in that
capacity and, after traveling about thirty miles, was injured.
The conductor testified that he had no authority from the
superintendent or from the defendant to engage or utilize the
services of the plaintiff in the capacity of brakeman. The

court said it was not necessary that there should be express authority for that purpose; that the circumstances themselves gave the authority. "In such an emergency, there must be discretion and authority somewhere to supply the place of disabled or missing servants; and no one could exercise this power so well or so prudently as the conductor in charge of the train. We will, therefore, treat the plaintiff as the lawfully employed servant of the company. Railroad companies are responsible for the conduct of their agents and officials done in the natural or necessary discharge of duties incident to the service they are employed in," citing *Railroad Co. v. Huffman,* 76 Ala. 492; *Railway Co. v. Heddleston,* 82 Ala. 218.

These cases rest upon the proposition that where one is charged by the master with the doing of a certain thing,—the management and control of a certain business for and in behalf of the defendant,—and an emergency arises where extra force is necessary to perform the work, or where temporary assistance is needed to carry on the duty assigned by the master, and the nature of the work suggests the necessity of assistance in its full accomplishment, there is an implied authority vested with the party charged with the work, to secure for the master this temporary assistance. This is the rule upon which the *Propst* case rests. That is to say, that where a brakeman is sick or absent or unable for any reason to perform the duties assigned to him, the conductor who has the charge and management of the train for the defendant, and of the work which the train is to do, has implied authority to procure the assistance of another to discharge these duties, and to accomplish the purpose of the master in the running of the train. As supporting this doctrine, see *Sloan v. Central Iowa Ry. Co.,* 62 Iowa 728.

It has been further held that where, because of sudden, unexpected emergencies, an extra force of brakemen is required for the accomplishment of the purpose entrusted to the conductor, there is an implied authority in the conductor to employ help. There are also cases holding that where one

assists the servants of another, at their request, for the purpose of expediting the master's business or his own business, the relationship of master and servant arises. See *Easton v. S. & E. T. R. Co.*, 65 Texas 577; *McIntyre St. R. Co. v. Bolton*, 43 Ohio 224; *Holmes v. N. E. Ry. Co.*, L. R. 4 Exch. 254.

These cases are made to rest primarily upon the proposition that the complainant was employed to assist by the one superintending and having charge and control of the work. These cases establish this proposition: One who, without employment, voluntarily undertakes to perform services for another, with his assent, stands in the relation of a servant for the time being, and the relationship between the volunteer and the servant is then that of master and servant, and the acquiescence of the party in charge of the work for the master may be inferred from the facts of assistance, with the knowledge and approval of the party having charge of the work.

In the case of *Newport News & M. V. Ry. Co. v. Carroll*, 31 S. W. (Ky.) 132, the action was brought to recover damages for injury sustained while attempting to couple cars on defendant's road. It appears that, for some reason, it was desirable to take out of the train two cars and place them on the sidetrack; that one Smith, who happened to be present, attempted to couple the cars to one already upon the sidetrack. The testimony shows that the conductor told him to couple the cars, and that he acted in obedience to this request. In that case, the company insisted that to entitle the plaintiff to recover it was necessary that he should show by affirmative evidence that the conductor had authority from the company to employ Smith to do the work. The court said, in substance, that the conductor, by virtue of his authority over the train, its management and control for and in behalf of the company, had that authority by implication, and the court said that it may be, as between the railroad company and the conductor, he had no such authority; but, so far as third persons are concerned, his action, orders, and employments in the man-

agement and conduct respecting the train under his control must be held binding upon the company.

This rests upon the proposition that the master having put the conductor in control of the train, of its management, for and in behalf of the master, he had the implied authority to use all reasonable and proper means to accomplish the purpose of the master, and to this end, had a right to employ, in an emergency, any necessary or proper assistance to that end.

We do not overlook the general rule, which is no doubt. law, for it has been repeatedly held by the courts, that if a person as a mere volunteer attempts to assist the servant of another, the master of the servant owes the volunteer no duty, and that the volunteer assumes all the ordinary risks incident to the work in which he engages, and that he cannot recover for injuries caused by a defect in the instruments used, or by the mere negligence of the servant. This was held in *Church v. C. M. & St. P. Ry. Co.*, 50 Minn. 218.

But this holding is not inconsistent with this further proposition that underlies our decisions, that after discovering that the volunteer has placed himself in a position of danger, the servant having failed to exercise reasonable care, after such discovery, to avert the danger, the master may be still held liable. The question turns, however, usually upon the authority of the servant to employ assistance; but as said before, this authority may be implied from the nature of the work assigned for him to do, and the necessity of employing assistance, apparent in the very nature and character of the work assigned, and it has been held that where the assistance is rendered with the permission of one who has authority, whether express or implied, to employ help, the one assisting acquires the rights of an employee. See *Trust Co. v. Texas & St. L. R. Co.*, 32 Fed. 448.

*Johnson v. Ashland Water Co., supra,* sustains this doctrine, and it is there held that where one in charge of the master's work requests another for temporary assistance in performing the defendant's work, though the servant expects

no pay and no obligation arises to pay, he is, for the time being, the servant of the defendant and entitled to the same protection as other servants.

The doctrine seems to rest upon the proposition that, where one is placed in charge of the master's work, and in the discharge of this work an emergency or a condition arises that requires assistance for the full performance and completion of it, and this necessity is apparent to the one in charge of the work, and to the one who offers assistance, and the assistance is rendered with the knowledge and consent of the party in charge, and is accepted by him as immediately and essentially necessary to the accomplishment of the task assigned by the master, the party assisting sustains the relationship of servant to a master, and where such condition or emergency arises in the discharge of the work assigned, there is implied authority on the part of the one who has the sole charge and supervision of the work to employ assistance under such conditions for and in behalf of the master.

In the case at bar, the work was assigned to Bates. It was recognized at the time that assistance might be necessary to accomplish it. The deceased was in the employment of the defendant in another department, but was present at the time the work was being done. Bates made one effort to place the pipe with the assistance of Hamm and Wilcox, but had failed. They were unable to accomplish the master's work without further assistance. Hamm, who was present assisting Bates, called for assistance. The assistance came. Bates accepted the services of the deceased because it was necessary to the accomplishment of the work assigned, and we think, because of the necessity for the service, the acceptance of the service by Bates was within his authority—that he accepted it, not for himself, but for the master, and to accomplish the master's work. Therefore the deceased was, at the time, engaged in the master's service, with the assent of Bates, who had implied authority from the master to accept his service, and it is wholly immaterial whether Bates heard Hamm's Macedonian

cry for help or not. The deceased came at the opportune time, came when he was needed, came to render assistance, his services were accepted and approved by Bates, who was then in charge of the work for the master.

We are not without authority in our own state for these propositions. See *Meier v. Way, Johnson, Lee & Co.,* 136 Iowa 302, second paragraph of opinion; *McGuire v. Mill Company,* 137 Iowa 447. See also *Collingwood v. Fuel Co.,* 125 Iowa 537; *Short v. Light & Power Co.,* 149 Iowa 303.

It is next contended that if the above be true, Bates was then a fellow servant, and under the fellow servant rule, the defendant is not liable for the negligence of Bates.

2. Master and servant: negligence: "fellow-servant" and "safe-place-to work" rules: application of. It must be remembered that the fellow servant rule rests upon the assumption that the party who is engaged in a distinct business assumes all the risks that are necessarily incident to that business, including the possible negligence of a fellow servant. The master is not held liable for the negligence of a fellow servant because such negligence could not by the master be anticipated and guarded against. It is, therefore, one of the risks which the servant assumes when he engages in an employment, together with all the risks that are incident to the immediate business in which he is employed—risks which the master could not anticipate and guard against by the exercise of such care as the law requires of him. The deceased was not employed at the time by the defendant in any hazardous business. He was called by the defendant's engineer to a business more hazardous than the one in which he was engaged, and hazards which were concealed and of which he had no knowledge. The dangers lurked beneath the floor, and by the exercise of no reasonable care on the part of the deceased, could they have been anticipated or guarded against. These dangers were well known to the engineer at the time he attempted to lower the pipe, and at the very time that deceased was assisting him in the work. The engineer, by the very nature of his employment, by the

position he occupied, and by his superior knowledge and skill, was in a position to direct and control, and did direct and control the work as it progressed. The record does not disclose that any specific directions were given by Bates to the deceased, but he does say in his own testimony that whatever directions were given as to how the work should proceed were given by him; that he alone had authority over the work to direct and control it. We do not think then that the fellow servant rule applies to the deceased in this case. The negligence of Bates was the negligence of the defendant. His authority to act, to do the thing, came directly from the defendant. The defendant, to add to the efficiency and better working of its plant, employed Bates to connect this exhaust pipe. It was not the ordinary work connected with the running of the business. It was work independent of the immediate operation of the plant, done for the betterment of the plant, work that no one had a right to do by virtue of his general employment, except under direction from the master. The power was delegated to Bates to do it. His act was then the act of the master. He says himself that he had absolute control not only over that department, but over this specific work after it was ordered to be put in. His negligence was the negligence of the master. Therefore it comes that the injury is chargeable directly to the negligence of the master in failing to provide a safe place to work, and guard the working men against unforeseen and unknown dangers, all of which could, by the slightest care, have been removed. The mere turning off of the switch would have avoided this fatal accident.

In *Madden v. Railroad Co.*, 32 Minn. 303, it was held that the servant does not take upon himself the risk, by reason of the neglect on the part of the master, where those risks arise from conditions known to the master, but unknown to the servant, unless it be shown that, by proper diligence, he could have discovered the danger and by the exercise of reasonable care, he could have avoided it.

The rule is that it is the duty of the master not to expose the servant to any injury which may be reasonably anticipated and guarded against. Of course, there is a difference in the rule where the danger is created naturally in the progress of the work itself, where the risk does not exist, but arises out of the doing of the work. That is, if the work is of such a character that in its progress it naturally creates a risk of injury, this should be anticipated and guarded against by the employee. The servant assumes these risks because they are incident to his employment. They grow out of the very thing he is doing, and are created thereby. He assumes the risk in such cases because the danger is incident to, and naturally arises out of, the work he undertakes to do, but this does not apply where the work in and of itself involves no risk, but the risk arises from matters and conditions permitted by the master to exist, which are unknown to the servant, and because of which the servant's safety is imperiled.

3. MASTER AND SERVANT: safe place to work: hidden dangers: no warning.

As said in *Martin v. Light Co.,* 131 Iowa 725, 733: ''The servant may properly be held to the risk of the extraordinary danger which is naturally incident to the extraordinary service; but he never takes the risk of the master's negligence under any circumstances, save when he knows of such negligence, or as a reasonably intelligent person ought to have known of it, and chooses to remain in the service.

As bearing upon this question, see *Collingwood v. Fuel Co.,* 125 Iowa 537. In this case it is said: ''That it is the duty of the master to provide a safe place to work is a rule of universal application. Accordingly, if the service is attended by conditions dangerous to the uninitiated, and not open and patent to the ordinary observation, the rule puts upon the master the duty to warn of the danger, and failing to do so, whereby injury occurs, he may be held negligent,'' citing *Eller v. Loomis,* 106 Iowa 276, and other cases.

This case further holds that the master may delegate the performance of this duty to a servant, but the responsibility

remains with the master if the duty is not done and injury results. Of course, in this *Collingwood* case, it was held that the duty—a breach of which constituted negligence—was the duty imposed upon the master by law, and we hold here that the duty rested on the master to warn the deceased of these lurking and hidden dangers which were known to Bates and out of which the injury arose. See also *Meier v. Way, Johnson Lee & Co., supra; McGuire v. Mill Company, supra; Vohs v. Shorthill & Co.,* 130 Iowa 538; *Kerker v. Wheel Co.,* 140 Iowa 209.

It is contended, however, that Bates did not call the deceased from his usual work to assist in this work in which he was injured. We hold that under this record, Bates had implied authority to secure additional assistance in placing this exhaust pipe if necessary to accomplish the work. We find that Hamm says that he was under the direction and control of Bates and called for assistance; that the deceased came, with the knowledge of Bates, with his approval. As Bates says, he needed his assistance and was glad to get it. He permitted him to assist. Hitchcock is dead. A mere call from Bates for assistance, if such a call had been made, would have added nothing to the situation. He needed help, he wanted help, his assistant called for help. He was near by at the time the call was made. The deceased came, and in rendering assistance was injured. It would be stretching the matter to a breaking point, and to do so would require such subtle reasoning that we are not disposed to say that Hitchcock was a mere volunteer, or that, under this record, no other conclusion could be justly reached by the jury.

1, 4. MASTER AND SERVANT: non-employing servant: implied authority in emergency.

Authorities are cited which it is claimed conclusively show that under this record, the plaintiff was a fellow servant with Bates, and the company was not liable for the negligence of Bates.

5. MASTER AND SERVANT: vice-principal or fellow servant: non-delegable duties.

It is well recognized in the law that a servant may occupy

a dual capacity. In one capacity, he may bind the master by his negligent act; that is where he is attempting to discharge a duty which the master owes to an injured servant. The other is where he is rendering a service for the master which it is not the duty of the master, for the protection of the servant, to do, but which is in the line of the general employment of the servant. An instance of the first would be where it is the duty of the master to furnish a safe place to work, and he delegates that duty to a servant, no matter how menial. The servant is then performing a duty for the master which the master owes to the other servant, and the master is liable for a negligent discharge of this duty resulting in injury. The master is not liable where the injury results from a negligent and improper manner of performing work which it is the duty of the servant to perform, and the performance of which involves no duty, on the part of the master, to the other servant.

We are cited to *Peterson v. C. R. I. & P. Ry.*, 149 Iowa 496. In that case it is apparent that the injury to the plaintiff was not due to the character of the place in which he was put to work, but the fault of Dreager in starting the machinery, thereby negligently creating a danger which did not theretofore exist. The danger was created by the act of the servant. His negligence could not be anticipated or guarded against, and the master owed no duty to the other servants to protect them against this act. It is said in that case that it became dangerous only by reason of the fault of Dreager in starting the machinery without proper warning. The place where the plaintiff in this case was required to work was perfectly safe, except for the negligent act of Dreager, who was, in the doing of the act, a fellow servant.

It is true that when the employer or those representing him have provided a place which is reasonably safe in itself, then the risk incident to the progress of the work as carried on by the employees is assumed by virtue of the

employment. The question of whether one is a fellow servant or a foreman, or superintendent does not depend upon the rank, but upon the nature of the act itself—whether it is one in connection with which the foreman is engaged with other employees in prosecuting a common undertaking. But it is the rule that where a servant is entrusted with the performance of a duty which the law enjoins upon the master, he is, as to such service, a vice-principal, and his negligence is the master's negligence.

The duties which the law enjoins upon the master are to furnish a reasonably safe place to work; reasonably safe tools and appliances with which to do the work; to give servants timely warning of dangers which are known, or ought to be known to the master, but which are neither known nor patent to the servant; to supply a sufficient number of competent workmen for the safe conduct of the particular labor in which the servant is engaged; to exercise such direction and control and supervision over the work as may be required to carry on the same with reasonable safety to all employed therein. Any failure in respect to these duties, whether by the master in person, or by any employee to whom the performance is committed, is negligence for which the master may be held liable. This negligence may consist of matters of omission or commission. This is the holding in *Beresford, Adm., v. American Coal Co.*, 124 Iowa 34.

We are also cited to *Barnicle v. Connor*, 110 Iowa 238; *Scott v. C. G. W. Ry. Co.*, 113 Iowa 381.

Every case has its own peculiar distinguishing facts, and it is sometimes difficult to draw the line of demarcation and say on which side of the line the rule contended for lies, but this we note, that in the cases cited, the act or the omission to act, out of which the injury arose, involved no positive duty enjoined by law upon the master. In the case at bar, the deceased was called to work at a place in which there were lurking dangers, unknown to him, but known to the one in

charge of the work for the master.  He was not warned of these dangers.

We quote the following from *C. N. W. Ry. Co. v. Bayfield*, 37 Mich. 205, opinion by Justice Cooley: "We also think that where the superior servant, by means of authority which he exercises by delegation of the master, wrongfully exposes the servant, and in consequence he is injured, the master must respond.  It is only where the risks particularly pertain to the business, and are incident to it, that the master is excused from responsibility."

This case holds to the doctrine that if the master sends his servant into a dangerous place, and thereby exposes him to risks not connected with the service in which he is employed, and in consequence he is injured, the master is responsible because the risk is not one which the servant has assumed; and that when, instead of being sent by the master in person, the servant is exposed to danger by the act of one who is placed over him, the liability is that of the master.

It is apparent that the deceased in entering the defendant's service assumed only such risks as arose from the negligence of his co-employees, and such as might be incurred within the scope of his employment.  He did not assume any dangers incident to the more hazardous employment without knowledge of the hazard, without notice of the dangers and where the dangers were such that he could not, by the use of reasonable care, have ascertained them.

As in point upon the question involved in this case see *Haluptzok v. Great Northern Ry.* (Minn.), 26 L. R. A. 739, 57 N. W. 144.  Judge Mitchell, delivering the opinion, said: "It is not necessary that a formal or express employment on behalf of the master should exist, or that compensation should be paid by or expected from him.  It is enough to render the master liable if the person causing the injury was in fact rendering services for him by his consent, express or implied. Under this view of the law, the evidence made a case for the jury to determine whether Westinghouse had implied author-

ity from the defendant to employ O'Connell as an assistant, or, to state the question differently, whether O'Connell was rendering these services for the defendant by its consent.''

It is true that in this O'Connell case Westinghouse had, for a long time, been employing assistants under similar arrangements to those made with O'Connell, and this was considered an important fact in the case.

It is next contended that the court erred in its instructions to the jury. A careful reading of these instructions shows them to be consistent with the facts and the law, and not subject to the criticism offered. It is

**6. WITNESSES: credibility of statements: rejection of positive assertions.** insisted that the court submitted to the jury the question as to whether Bates heard the call for assistance, as a fact upon which the jury might pass, whereas Bates swore positively that he did not hear the call: but the evidence, however, is that the call was given by Hamm; that Bates was there at the time; that immediately upon the call, these parties came to the assistance of Bates. The jury might well have found, notwithstanding Bates' statement that he did not hear, that he did, in fact, hear but had forgotten the circumstance.

We do not find any reversible error in the case, and the cause is, therefore, affirmed. The other errors assigned are disposed of by what has been heretofore said.—*Affirmed.*

DEEMER, C. J., LADD and SALINGER, JJ., concur.