[File No. 7157]

FRANK OLSON v. KEM TEMPLE, Ancient Arabic Order of
the Mystic Shrine, A Fraternal Corporation

(43 NW2d. 385)

366

Opinion filed June 17, 1950
Rehearing denied July 15, 1950

*Burtness & Shaft,* for appellant.

*Day, Lundberg, Stokes, Vaaler & Gillig,* and *Philip R. Bangs,* for respondent.

MORRIS, J. The plaintiff seeks to recover damages for personal injuries received by him in falling from a ladder while decorating the interior of a pavilion at the fair grounds in Grand Forks, N. D., preparatory to a social function given by the defendant. The jury rendered a verdict for the plaintiff, whereupon the defendant made a motion in the alternative for judgment notwithstanding the verdict or for a new trial. The trial court granted the motion for new trial "on the ground that the evidence is insufficient to support the verdict in that the evidence does not show that the defendant was negligent, or that the plaintiff was free from contributory negligence;". The plaintiff appeals from the order granting the new trial.

The main part of the pavilion where the accident occurred is a dance floor about 100 feet in length and 60 feet wide. It is located some distance from the meeting place and headquarters of the defendant where its paraphernalia and property are kept. The stage director of the defendant arranged for the plaintiff and four other members of the defendant corporation to do the decorating. They went to the pavilion about six o'clock on the morning of July 10, 1948. There was no one at the pavilion to direct them and they arranged by consultation among themselves how the work was to be done. There was a wire running lengthwise through the center of the building from 15 to 16 feet above the floor. A part of the decorating scheme

required paper streamers to be run from the sides of the building to this wire. The stage director had caused a stepladder to be taken from the defendant's property room to the pavilion to be available for the use of the decorators. The plaintiff set this ladder up under the wire and while attaching paper streamers to the wire he fell from the ladder and was injured.

The ladder had been given to the defendant by one of its members some fifteen years before the accident. It was kept in and about the defendant's property room and had been put to various uses including that of cleaning windows. It was described by two witnesses as "rickety". It was of light construction and weight. It had been repaired from time to time by laying it down on its side and tightening up the nails and screws so as to make it more rigid. The steps fitted into grooves. It was fourteen feet in length when folded and somewhat less than that when set up with the supports extended. A cross brace between and near the bottom of the two supports had been missing for a number of years but its absence does not appear to have contributed to the accident.

When the plaintiff set up the ladder under the wire he saw to it that the ladder was level on all four legs. He saw nothing that would cause him to think that it was unsafe. He is six feet one inch in height. The wire was about a foot and a half above the ladder. The plaintiff ascended until the wire was about shoulder height. He then attached some streamers, descended and moved the ladder along under the wire, then ascended again and attached more streamers. He repeated this process eight or ten times over a period of an hour prior to the accident As he moved the ladder along under the wire he found that it was higher near the center of the building. When he ascended the last time he stepped up one step higher than he had been before. The step tipped and he fell to the floor and was injured. The plaintiff had never used the ladder prior to the morning of his injury but had seen it in the defendant's property room. In his use of the ladder the plaintiff placed his hands on the sides as he ascended and descended. There is no evidence that anyone noticed that a step was loose or would tip prior to the accident. When one of the plaintiff's fellow

workers picked up the ladder after the accident he noticed that the second or third step from the top could be tilted back and forth. It does not appear whether this is the step that caused the plaintiff's fall or whether it was one higher up. None of the plaintiff's fellow workers saw the beginning of his fall. There is no substantial conflict in the evidence.

The plaintiff was requested to perform certain services for the defendant with materials, tools, and appliances furnished by the defendant's authorized representatives. The plaintiff was injured while performing services that he had agreed to perform for the benefit of the defendant. The services were gratuitous. Our statutory law recognizes but does not define a gratuitous employee. Sec. 34–0204 RCND 1943. It is clear that this statute contemplates that one who undertakes to do a service for another at the other's request but without consideration is a gratuitous employee while engaged in the performance of such service. Sec. 34–0203 RCND 1943 provides that "An employer, in all cases, shall indemnify his employee for losses caused by the former's want of ordinary care." This provision is applicable in the case of a gratuitous employee as well as an employee for reward. The plaintiff was a gratuitous employee acting within the scope of his employment at the time he was injured. Under the circumstances here presented the same rules of liability apply as in the case of master and servant.

It is the general rule that an employer is bound to use ordinary care to furnish his employees with reasonably safe and proper tools and appliances with which to work. Meehan v. Great Northern Railway Company, 13 ND 432, 101 NW 183; Prefontaine v. Great Northern Railway Company, 51 ND 158, 199 NW 480; 35 Am Jur, Master and Servant, Sec. 138 and 175; 56 CJS, Master and Servant, Sec. 206. This rule of general liability is subject to a widely recognized exception. Where the tool or appliance is simple in construction and a defect therein is discernible without special skill or knowledge, and the employee is as well qualified as the employer to detect the defect and appraise the danger resulting therefrom the employee may not recover damages from his employer for an injury due to

such a defect that is unknown to the employer. Varied and extensive application of the "simple tool" doctrine is disclosed by these authorities 35 Am Jur, Sec. 143; 56 CJS, Master and Servant, Sec. 216; Labatt's Master and Servant 2nd Edition, Sec. 924 a; Vanderpool v. Partridge, 79 Neb 165, 112 NW 318; 13 LRA NS 668, and note. Annotations on the ladder as a simple tool are found in 13 LRA NS 687, 145 ALR 542, and 40 LRA NS 832.

The great weight of authority is to the effect that an ordinary portable stepladder is a simple tool or appliance within the meaning of the simple tool doctrine. Kelley v. Brown, 262 Mich 356, 247 NW 900; Nichols v. Bush, 291 Mich 473, 289 NW 219; Mozey v. Erickson, 182 Minn 419, 234 NW 687; Person v. Okes, 224 Minn 541, 29 NW2d 360; Hall v. United States Canning Company, 76 App Div 475, 78 NYS 617; McGill v. Cleveland and Southwestern Traction Company, 79 O St 203, 86 NE 989, 19 LRA NS 793, 128 Am St Rep 705; Roper v. Ware Shoals Manufacturing Company, 139 SC 48, 137 SE 210.

In Etel v. Grubb, 157 Wash 311, 288 Pac 931, the Supreme Court of Washington refused to apply the simple tool doctrine in a stepladder case. In Puza v. C. Hennecke Company, 158 Wis 482, 149 NW 223, the court held that a stepladder was a place to work and declined to apply the simple tool doctrine. We agree with the majority of courts that an ordinary portable stepladder is a simple tool or appliance and that the employee who uses it is usually as well qualified to detect any defect therein as is the employer who furnishes it.

The ladder in question may have been somewhat longer than the average stepladder but it was otherwise of usual construction and there is no intimation that the height of the ladder in any way contributed to the accident. The plaintiff was several steps from the top when he fell. He set up the ladder in the first instance and ascended and descended some eight times over a period of about an hour prior to the accident.

Much stress has been laid on the testimony that the ladder was "rickety", or as one witness states "wobbly", and had been in that condition for a number of years. None of the witnesses

testified that knowledge of this condition was acquired through special inspection or any unusual examination. The inference is that the rickety condition was obvious. If this be so, its condition must have been apparent to the plaintiff as he set up the ladder, ascended and descended, and moved it along under the wire as his work of attaching the streamers progressed. All of the witnesses to the accident and the condition of the ladder, including the plaintiff, were members of the defendant fraternal corporation and all were engaged in the project of preparing for the entertainment of an important guest. The plaintiff's opportunity to appraise the danger attendant upon the use of the ladder was at least equal to that of the officers and members upon whose knowledge and conduct he seeks to base a charge of negligence against the defendant. If the ladder was rickety or wobbly it was a condition of such a nature as to be discovered by that observation which would naturally accompany its use.

The plaintiff's testimony indicates that he does not attribute the accident to the general debility of the ladder, but to the fact that a step tipped when he placed his weight upon it. The condition of the step was not obvious and there is no evidence that anyone knew the step was loose prior to the accident. Consequently, none of the officers or agents of the defendant had an opportunity or an obligation to warn the plaintiff of the loose step. In the absence of knowledge, liability of the defendant resulting from this defect could only arise from an obligation on the part of its officers and agents to make a more thorough and detailed inspection than the plaintiff was obliged to do. This obligation on the part of the defendant did not exist with respect to a simple tool or appliance, the ability to inspect and the opportunity to do so being equal.

The defendant made a motion in the alternative for a judgment notwithstanding the verdict or for a new trial. The court granted the new trial, thus impliedly denying the motion for judgment notwithstanding the verdict. The plaintiff has appealed from the order granting a new trial, on the ground that the verdict should be sustained. Upon the record here presented

he is in error in this contention. The order appealed from is affirmed.

BURKE, J., concurs.

NUESSLE, Ch. J. I concur in the result reached in the foregoing opinion written by Judge Morris, and in the syllabus of the points adjudicated.

The plaintiff, a member of the defendant fraternal organization, volunteered to assist in decorating a hall to be used by the defendant. The defendant provided a stepladder for his use. This was an ordinary stepladder such as is described in Webster's New International Dictionary as "A portable set of steps, esp. one with flat, comparatively broad steps in place of rungs and with a frame hinged to the back for steadying." The defendant had owned this ladder for about 16 years. It was in general use and had been used about defendant's premises by many of its members. It was of light wood construction. The evidence as to its condition is that it was old, rickety, and wobbly, as was apparent to anyone seeing or using it. "Its joints were loose and they squeaked and wiggled when you walked on them." It was 12 or 14 feet in height when not spread. If a user stepped on the upper steps and moved around it swayed somewhat and required someone to stand beside it and steady it. It had been repaired on occasion by being renailed or having its screws tightened or both. It was given to the defendant by one of its members who was a trucker. He had bought it from a customer for whom he did some moving, and the occasion for his buying it was that it was too long to be carried in the moving van. It was never used in his business.

Plaintiff used this ladder in stapling streamers to a wire stretched 12 or 15 feet above the floor across the hall that was being decorated. Before using the ladder, plaintiff tested it to see if it would stand firmly. He had used it for an hour or thereabouts without accident. It then became necessary for him to climb one step higher than before. He says that this step was loose and turned under his foot, causing him to lose his balance and fall. The step was six or eight feet from the floor.

There is no doubt but that he suffered very serious. injuries from this fall. When he fell, he fell to one side and the ladder tipped over in the opposite direction. The ladder itself was not available for inspection at the time of the trial.

The case was tried to a jury. Plaintiff had a verdict. On motion made, the trial court ordered a new trial on the ground "that the evidence is insufficient to support the verdict in that the evidence does not show that the defendant was negligent, or that the plaintiff was free from contributory negligence;" and this appeal is from that order.

The defendant contends that the simple tool doctrine controls in the instant case. That this ladder was a simple tool. That its condition was as discernible to the plaintiff or to any other user as it was to any of the officers of the defendant, none of whom had particularly examined it. That therefore there was no actionable negligence on its part. .

I am of the opinion that whether or not the ladder be considered a simple tool, the mere fact that defendant provided it for plaintiff's use without particularly pointing out to him its condition does not constitute actionable negligence. The plaintiff was a member of the defendant organization. He volunteered his services. He was acting under no compulsion. If the condition of the ladder was as discernible to him on such examination as any reasonably prudent person would give to it before using it, as it was to any of the officers of the defendant, then there can be no liability for negligence on the defendant's part. The plaintiff was no zany. He was an intelligent, capable, and experienced man. This is evidenced by the fact that he had risen from telegraph operator and small station agent to the important position of train dispatcher.

The established rule in this state is that whether a motion for a new trial shall be granted or denied is largely discretionary with the trial judge, and unless there is an abuse of discretion on his part, his order granting or denying it will not be disturbed. And this is particularly so when a new trial is granted. In fact, in some jurisdictions an order granting a new trial is not appealable. See Martin v. Parkins, 55 ND 339, 213 NW 574, and authorities cited therein. Viewed in the light

of the foregoing rule, I am of the opinion that the record is such that the order appealed from should be affirmed.

CHRISTIANSON, J. (dissenting). I agree with paragraphs 1 and 2 of the syllabus and with those parts of the opinion prepared by Judge Morris to which those paragraphs relate; but I do not agree with the remainder of the opinion or with the concurring opinion of the Chief Justice. I am of the view that the questions of negligence, contributory negligence, and assumption of risk were for the jury, and that the verdict of the jury is supported by the evidence.

The plaintiff is a train dispatcher for the Great Northern Railway Company at Grand Forks. The defendant is a fraternal corporation organized under the laws of this state. On July 10, 1947, plaintiff sustained severe personal injuries as a result of falling from a ladder while he was working for the defendant decorating a pavilion at the fair grounds. The pavilion had a "dance floor" some hundred feet in length and sixty feet in width. It had a high arched ceiling with timbers across. There were wires running lengthwise the entire length of the building. The wires were used for placement of decorations when ceremonies, dances, or festivities were held therein. There was a stage about the middle of the floor on which the orchestra was seated. The wire was approximately fifteen feet from the floor at each end and approximately sixteen feet at the center. The Imperial Potentate of the Mystic Shrine was scheduled to visit Kem Temple on July 10, 1947, and the officers of the defendant were making arrangements for his reception and festivities incident thereto at the pavilion.

Pierce and McIver were officers of the defendant corporation. Pierce was the Potentate, (the chief officer) and McIver was the stage director. Shortly before July 10, 1947, McIver, the stage director of the defendant, contacted the plaintiff and asked him to do some work at the pavilion in preparation for the festivities. The plaintiff agreed to come and work. He testified that he was told there would be a ladder at the pavilion. In the early morning of July 10, 1947, the plaintiff and four other men drove out to the pavilion to engage in the work which had

been assigned to them. These men were Cloyd Steenerson, Ben Grove, Clarence Misner, Jake Hoffman and the plaintiff, Frank Olson. They found that certain equipment, including a long step ladder, had been delivered. They first conferred with respect to the work to be done and the division of the work. Steenerson had decorated the stage on previous occasions. It was agreed that he and Grove should work at that and that in decorating the main hall the plaintiff Olson should fasten the streamers on the wire and that Misner and Hoffman should place the ends of the streamers at the sides as they hung from the wire. The plan for decorating the main hall was to create a tent-like appearance with paper streamers coming from the wire and fastened at the sides.

Plaintiff testified that only one ladder had been brought and left at the pavilion for use of the men in their work; that it was a wooden ladder about fourteen feet high; that he had never used the ladder but had seen it standing in the cloak room or property room in the Temple in Grand Forks; that the ladder tapered so that it was narrower at the top than at the bottom; that there were two back legs which folded when the ladder was taken down and that when these were extended the ladder had four legs and that there was a brace at the top to be pushed down which would lock the ladder and make it solid; that when he was ready for work he took the ladder and pushed down the brace at the top so as to make the ladder solid; that when he set the ladder up for use he shook it to be sure it was balanced on all four legs on the floor; that he did not make a personal inspection of each of the steps but that he looked and did not see anything to indicate that it was unsafe. He said, "When I set it up for using it, I made sure the center part was down, and I shook it to be sure it was balanced on all four legs on the floor there. I saw that the ladder was level on all four legs, and the ladder appeared safe to use. I didn't see anything that would cause me to think that the ladder was unsafe." He testified that he had used the ladder for about an hour when the accident occurred; that he did not notice that any of the steps in the ladder were weak or weakening; that the floor was clean and dry and that there was no rubbish on it; that in work-

ing he climbed just high enough so he could reach the wire; that he did not have to reach up to put the streamers over the wire; that he ascended the ladder only high enough so that his shoulders would be opposite the wire; that the operation was to slip a streamer over the wire and then staple it; that immediately before he fell he had reached a point where the wire was higher and it became necessary for him to take one step higher than he had before; that the step on which he then stepped was probably about six or seven feet from the floor; that the step tilted and he started to fall; that he did not lose his balance, that it was the tilt that caused him to fall; that at the place the accident occurred the wire was approximately sixteen feet above the floor; that he did not see the ladder after the accident and did not know personally whether the step broke.

It is undisputed that plaintiff sustained severe personal injuries as a result of the fall.

Pierce testified that in July 1947 he was acting Potentate (chief officer) of the defendant corporation and that one McIver was stage director; that as acting Potentate he instructed McIver, the stage director, to make the necessary arrangements to have the pavilion at the State fair grounds prepared and decorated for the festivities to be had incident to the reception of the Imperial Potentate. Pierce further testified that he was quite familiar with the ladder from which the plaintiff Olson fell and had been so for some sixteen years. He said the ladder was a flimsy, rickety ladder and was wobbly. He stated that he saw the ladder at the pavilion the evening before the accident occurred, but made no inspection of it. In answer to a question whether there was anything wrong with the ladder other than he had stated he answered "no." He further testified that he was acquainted with Olson, the plaintiff; that after the accident he visited him at the hospital several times and that on one or two of these occasions he told him the ladder was so unsafe it should never have been sent out to the pavilion at all.

McIver testified that in July 1947 he was stage director of the defendant corporation; that the stage director is appointed by the Potentate and an active member of the appointive divan; that as stage director he had a crew of twenty-four men work-

ing under his direction; that he was instructed by the Potentate to have the pavilion at the fair grounds decorated and put in proper shape for the reception of the Imperial Potentate. That the defendant had a lot of equipment to be used for occasions of that kind and that he made arrangements with men to decorate the pavilion, that plaintiff Olson was one of the men; that such arrangements were made about July 7th or 8th; that he arranged with one Hiler of the Hiler Transfer Company to take certain equipment out to the pavilion, including a ladder to be used in putting up the decorations "especially the paper streamers." He testified that he was out at the pavilion the evening before the accident and observed the various articles that he had arranged to send out; that the stepladder was approximately fourteen feet high; that he saw it there that evening; that the ladder was usually kept in the property room off the stage and sometimes in the cloak room in the Temple. He testified that he had been familiar with this ladder for about fifteen years; that the ladder was rickety, that the joints of the ladder were loose; that they squeaked and wiggled when you walked on it and that the ladder would wiggle a little when you got near the top.

Hiler testified that he served as stage director of Kem Temple from 1932 to 1943; that he is in the transfer business in Grand Forks and hauled the equipment referred to in the previous testimony to the pavilion; that among such equipment there was a long stepladder which he (Hiler) had donated to the defendant about 1931 and that it has been retained by the defendant since that time; that he purchased the ladder from a customer who was moving away and found that the ladder was too long to get into the moving van; that during the time he served as stage director he repaired the ladder, that he laid the ladder down on the side and tightened the nails and screws in it so as to make it more rigid; that the steps in the ladder were fitted into grooves; that he was familiar with the condition of the ladder shortly before it was taken to the pavilion. When asked "What was its condition?" he answered: "It wasn't too bad. I wouldn't want to get up on the top of it and stand on it without somebody steadying it. But it was rickety as

McIver said a while ago. If you got up and moved around it would sway. If somebody was there to steady it, it was all right. And if you got up and stood perfectly still it was all right. But it wasn't good to get up to the top and reach over three or four feet to calcimine or paint or anything of that sort." The ladder was unsafe for such use. It was high and of light construction and made of soft wood; that the ladder had flat steps instead of rungs; and that he knew the ladder had been renailed at times but did not know when it was last renailed before the accident.

Grove testified that he was one of the men who went to the fair grounds with Steenerson and the plaintiff; that after the men reached the pavilion they discussed the work to be done and how it should be divided. It was decided that Steenerson and Grove should decorate the stage and that the plaintiff Olson should put up the decorations, that is, the streamers that were to be placed on the wire, that in doing this work Olson used the ladder to enable him to fasten the paper streamers to the wire; that the ladder was in the pavilion when they arrived that morning; that at the time the accident occurred the plaintiff was nearing the center of the pavilion,—the place where Grove and Steenerson were working, that he (Grove) happened to turn around and saw the plaintiff falling; that the plaintiff had left the ladder and was between the step on which he had been standing and the floor when Grove noticed him; that after the plaintiff fell Grove and Steenerson rushed to where he was and took him off the floor and later to the hospital; that they later came back and went on with their work; that after they were through with their work he kicked out the last step of the ladder so that people might know it was not fit to be used again.

Steenerson testified that he was one of the men who went to the pavilion on the morning of July 10, 1947, to assist in preparing the pavilion for the reception of the Imperial Potentate; that he brought the plaintiff Olson and Grove out in his car; that they arrived at the pavilion about 6 o'clock in the morning and that Misner and Hoffman came later; that he worked at decorating the platform or stage where the orchestra sits; that

the plaintiff went to work decorating the main pavilion and hanging streamers on the wire that ran lengthwise through the pavilion; that in the performance of such work he was using the step ladder; that he fastened the streamers to the wire with a stapler; that he (Steenerson) heard a noise and as he looked around noticed that the ladder had tipped over on the floor and that the plaintiff was lying on the floor close by; that he helped take him to the hospital; that later he came back to the pavilion and went on with the work; that they wanted to use the ladder and when asked what, if anything, he observed, he said: "I found in picking up the ladder—I grabbed ahold of it or something—by one step up toward the top—I found it was loose. I wouldn't say it was so loose you could shake it, but it was loose so you could tilt it back and forth." He further testified that the step to which he referred was up towards the top; that he would not say it was definitely the second or third step from the top but it was thereabout. When asked to show the jury what he meant by the step tilting he said: "The step goes in from the side, and it moved this way (indicating with hand)." The steps were in grooves on the side supports of the ladder. When asked what he would say as to the condition of the ladder from what he saw he answered: "I know it wouldn't be safe enough to have around my home. It was that unsafe." He testified that after they were through using the ladder he broke it so that it could not be used again by anyone; that he took a two by four and knocked out some of the steps so that if anyone else found the ladder around they could know it should not be used. He said: "I wasn't going to let anybody else get hurt on it. If the ladder was unsafe, which we assumed it was, we weren't going to let it lay around for somebody else to come along and climb up and have something happen to them."

It will be noted that the evidence in this case shows that the plaintiff sustained serious injuries as a result of a fall from a step ladder while he was performing certain work for the defendant in decorating a pavilion; that the step ladder which plaintiff was using and from which he fell had been furnished by the defendant for use in performing the particular work plaintiff was performing at the time he fell; that the plaintiff

had no part in selecting the step ladder; that it was the only appliance made available to the plaintiff by the defendant for use in performing his work; that the fall was occasioned by a defect in the ladder, namely, by a step that tilted or tipped when the plaintiff in the use of the ladder stepped upon it and that this resulted in plaintiff's fall and injuries. Plaintiff's cause of action is predicated upon the proposition that the defendant was negligent in failing to furnish a safe appliance or tool and is liable in damages for the injuries sustained by the plaintiff as a result of defendant's negligence. The defendant denies that it was negligent and asserts that if it were the plaintiff assumed the risk and was guilty of contributory negligence. The issues thus framed were submitted to the jury under instructions quite favorable to the defendant. The jury determined all questions in favor of the plaintiff and returned a verdict in his favor.

The laws of this state provide:

"An employer, in all cases, shall indemnify his employee for losses caused by the former's want of ordinary care." NDRC 1943, 34–0203.

An employer owes to his employees "a duty to exercise reasonable care to furnish employees with safe tools and appliances with which to do their work, and an employer may be held liable to an employee or his representatives for injury or death resulting from the employer's failure to comply with such duties." 35 Am Jur, Master and Servant, p 569, Sec 138; CL 1913, Sec 6108; NDRC 1943, 34–0203; Cameron v. G. N. Ry. Co. 8 ND 124, 130, 77 NW 1016; Meehan v. G. N. Ry. Co. 13 ND 432, 101 NW 183; Prefontaine v. G. N. Ry. Co. 51 ND 158, 199 NW 480; 56 CJS pp 900, 912.

Corpus Juris Secundum says:

"Broadly stated, it is the positive duty of a master to furnish his servant with suitable and safe instrumentalities wherewith and places wherein, to do his work." 56 CJS p 900.

"It is actionable negligence on the part of a master to fail to furnish, or to fail to exercise ordinary or reasonable care to furnish, his servant with such proper tools and appliances as

may be required for the reasonably safe prosecution of the work." 56 CJS p 912.

There is no denial of the existence of these general rules but it is said in the principal opinion that these rules are subject to an exception in the case of simple or common tools; that the step ladder in question here was a simple tool and that consequently there was no breach of duty on the part of the defendant even though the step ladder was not a safe tool and a defect therein resulted in plaintiff's injury.

The "so-called simple tool doctrine" is not a rule having a definite or settled meaning. It is true as said in the principal opinion the authorities disclose there has been "varied and extensive application of" this doctrine, but an examination of the adjudicated cases discloses that even in the same jurisdiction the adjudicated cases are not always in harmony. The application of the so-called doctrine by the courts and the results have been summarized by Labatt in his work on Master and Servant as follows:

"In many cases, undoubtedly, where the injury was caused by defects in simple tools, the ordinary rules in regard to the master's duty to use ordinary care to furnish reasonably safe appliances have been applied without reference to the fact that the alleged defective appliance was in fact a simple tool; but in many cases of this character the courts have made a distinction between injuries caused by the so-called simple tools and those caused by more complicated and dangerous appliances. In view of the large number of decisions involving cases of this character, it has been considered desirable to bring the cases together in one section, although many of them would more logically be placed in various other parts of the treatise.

"In some cases the courts have gone to the length of stating that the rule requiring the master to use ordinary care to furnish reasonably safe appliances does not apply where the injury was caused by a simple tool. In other cases it is said that the master is not required to anticipate that injuries may result from the use of defective simple tools. Again, some cases say simply that the master is not liable for injuries caused by simple tools, without specifying the particular ground of the nonliabil-

ity. The most frequent application of the so-called simple-tools doctrine is found in those cases which hold that the duty of the master in respect to simple tools is not continuous, and he is under no obligation to inspect simple tools which he has placed in the hands of his servants for use. . . .

"It does not seem entirely logical to say that the master is under no obligation to exercise ordinary care to furnish reasonably safe appliances, simply because those appliances chance to be of a simple character. The more reasonable view would seem to be to place the nonliability of the master upon the ground that any defect in a simple tool must be obvious to the servant, and any risk of danger therefrom must be held to be assumed by him; and this, indeed, is the view taken very frequently.

"Other cases dismiss the allegations of negligence on the part of the master by the statement that the defect was obvious, or was as obvious to the servant as it could have been to the master, without directly invoking the rule of assumption of risk. . . .

"Other cases take the rather extreme view that if a servant is injured by reason of defective simple tools, he must necessarily be guilty of contributory negligence. . . .

"In some jurisdictions the simple-tool rule has been repudiated, or at least restricted in some cases.

"It is submitted that, as has been indicated above, it is illogical and unreasonable to say that the master is free from the obligation of using ordinary care merely because the appliance to be furnished is a simple tool, but the better view is that the appliance being a simple tool, and entirely understood by the servant, the latter's obligations to his master and to himself are increased; and cases involving injuries from simple tools furnish a broader scope for the application of the various affirmative defenses which are ordinarily available to the master." 3 Labatt's Master and Servant, 2d Ed., Sec. 924a, pp. 2476-2484.

The "so-called simple tool doctrine" is not applicable to actions under the Federal Employers' Liability Act for injuries sustained by an employee through a defect, due to employer's negligence, in its appliances and equipment; simple as well as complex tools are within such act. . Pitt v. Pennsylvania R. Co., 66

F Supp 443; 161 F2d 733; Cole v. Seaboard Airline Ry. Co., 199 NC 389, 154 SE 682; Seaboard Airline Ry. Co. v. Cole, 282 US 898, 75 L ed 791; Gekas v. Oregon-Washington R. & N. Co., 75 Ore 243, 146 P 970; Jacob v. City of New York, 315 US 752, 86 L ed 1166. In Jacob v. City of New York, supra, the Supreme Court of the United States held that the so-called simple tool doctrine is not applicable to cases arising under the Jones Act (46 USCA Sec 688), which made the provisions of the Federal Employer's Liability Act relating to cases of personal injuries of railway employees applicable to cases of personal injuries of seamen.

In Jacob v. City of New York, supra, an employee engaged as a water tender on a ferry boat sustained an injury while he was using an ordinary S-shaped open end wrench to tighten a nut on the manifold head when the wrench slipped because its jaws had become worn by use causing the employee to lose his balance and fall. The trial judge in taking the case from the jury relied on the simple tool doctrine. The Circuit Court of Appeals in its opinion affirming the trial court also referred to the so-called simple tool doctrine and held that the plaintiff was not entitled to recover "because the master has been guilty of no negligence with respect to the tool used by the employee." 119 F2d 800, 802. The Supreme Court of the United States held that the Circuit Court of Appeals was in error in so holding. In the course of its opinion the court made the following pertinent observations concerning the so-called simple tool doctrine:

"The simple tool doctrine, used by the courts below to bolster their belief that the evidence was insufficient, does not affect our conclusion. In the first place, the contrariety of opinion as to the reasons for and the scope of the simple tool doctrine, and the uncertainty of its application, suggest that it should not apply to cases arising under legislation, such as the Jones Act, designed to enlarge in some measure the rights and remedies of injured employees." 315 US at pp 756–757, 86 L ed at p 1170

"The employer does not fully and finally discharge himself from liability to his employees by furnishing suitable tools,

machinery, and appliances; he is bound to see that his instrumentalities are maintained in a safe condition." 35 Am Jur, Master and Servant, Sec 140, pp 570-571; 56 CJS pp 988-989; Cameron v. G. N. Ry. Co., supra; Meehan v. G. N. Ry. Co., supra. In short the employer's duty is twofold: (1) to furnish his employee with reasonably safe tools, and (2) to see that such tools are maintained in a safe condition.

In Meehan v. G. N. Ry. Co., supra, it was held that the employer had performeed the duty it owed its employee to furnish suitable and safe appliances and that the ground for liability of the defendant, if any, was for breach of its duty to maintain the appliances in safe condition.

As is pointed out by Labatt in the above quoted statement from his work on Master and Servant, the most frequent application of the so-called simple tool doctrine is found in cases involving the question whether the employer had been negligent in failing to keep the tools which he had furnished to the employee in safe condition. In most of such cases the employer had furnished reasonably safe tools and placed the same in the hands of the servant for use and the defect or disrepair had arisen while the tools were in the possession of the employee. This case is predicated upon the failure of the employer to furnish safe tools to his employee, and is not predicated upon the failure of the employer to see that tools which he had furnished were maintained in safe condition.

Obviously the character of a tool is an important matter for consideration in determining whether the employer has exercised due care in furnishing a reasonably safe and suitable tool to the employee for the performance of his work. But it is one thing to say that the character of the tool is a matter to be considered in determining whether the employer exercised due care in the performance of his duty to furnish his employee with a safe tool and quite another to say that because a tool is simple the employer has no obligation to furnish a safe tool, as has been held in some of the cases in applying the so-called simple tool doctrine. Such holdings are in effect an abrogation of the fundamental rule in force in this jurisdiction throughout its entire history that it is the duty of the employer to furnish his

employee with safe and suitable tools. As has been well said by Labatt: "It is illogical and unreasonable to say that the master is free from the obligation of using ordinary care merely. because the appliance to be furnished is a simple tool" and many courts reject any such theory and hold that the fundamental duty of the employer to furnish safe tools and appliances to an employee applies alike to simple and complicated tools. Gekas v. Oregon-Washington R. & N. Co., 75 Ore 243, 146 P 970; Mercer v. Atlantic Coast Line Railroad Co., 154 NC 399, 404, 70 SE 742; Buchanan & Gilder v. Blanchard, Tex CA, 127 SW 1153; Fishburn v. International Harvester Co., 157 Kan 43, 138 P2d 471; Neely v. Chicago Great Western R. Co., et al., Mo CA, 14 SW2d 972; Hines v Flinn, Tex CA, 222 SW 670; Cole v. Seaboard Airline Ry. Co., supra; Jacob v. City of New York, supra. "In furnishing a tool of any kind, the master is bound to use ordinary care for the safety of the servant who uses it." Drake v. San Antonio & A. P. Ry. Co., 99 Tex 240, 89 SW 407. In Gekas v. Oregon-Washington R. & N. Co., supra, the court said:

"It is the duty of the master to use ordinary care to provide his servant with reasonably safe tools and appliances, and this is a general rule of law which regulates the master's duty without relating to the specific character of the tools and appliances in question. The term 'ordinary care' implies such care as the probable danger of injury would suggest to a reasonably prudent man. It applies to all men in all walks of life in which they come in contact with others. Ordinary care is required in the furnishing of either simple or complex tools. The only difference is that, in the case of complex and dangerous tools, an ordinarily prudent man would use a greater degree of care."

No case has been presented to this court for determination wherein the so-called simple tool doctrine was invoked or considered. The court, however, has had presented to it for determination at least one case wherein recovery was sought and had for injuries caused by defects in what has been denominated a simple tool. Thus, in Prefontaine v. G. N. Ry. Co., supra, an employee of the railway company brought suit to recover for injuries alleged to have been sustained as the result of a defec-

tive handle on a pick used by the employee in the performance of his work. The employee used the pick for the purpose of breaking chunks of coal into pieces. He testified that he worked for several days with a pick having a split handle, that he complained to the foreman and that the foreman told him that no extra pick handles were on hand but promised to supply a new handle as soon as possible. The handle was not supplied. The plaintiff quit work because of the pain and injury to his hand. He brought action against the railway company for injuries alleged to have been sustained by reason of the negligence of the company in failing to furnish reasonably safe and proper tools and appliances with which to perform his work. The railway company denied negligence and the case was submitted to a jury which returned the verdict in favor of the plaintiff. The defendant appealed to this court contending that the evidence did not establish actionable negligence on the part of the defendant. This court held that the verdict was supported by the evidence and affirmed the judgment.

The plaintiff in this case had no part in selecting the step ladder. He was given no right to select a tool or appliance for the work. The ladder was furnished by the defendant to be used by the plaintiff in hanging the decorations from the wire, and no other tool was made available for such work. It was not a short step ladder such as is generally used around dwellings and offices. It was considerably longer. Indeed, it was so long that the former owner was unable to place it in the van in which certain articles were moved from Hiler's warehouse. It had been in the possession of the defendant and used by it for many years. During such time it had been found necessary to repair it from time to time by renailing the steps or fastening them with screws. How many times this occurred the evidence does not disclose nor does it disclose the last time it was done. The ladder was furnished for the purpose of being used in doing the particular work for which plaintiff was using it at the time the accident occurred. McIver (the stage director) testified that the ladder was sent to the pavilion to be used in putting up the decorations *especially the paper streamers*. The defendant's

representatives knew that it would be necessary for the plaintiff in performing his work to ascend the ladder to such height as to enable him to fasten the paper streamers to the wire at a point where the wire was some sixteen feet above the floor. When the stage director asked the plaintiff to do the work the plaintiff was informed that a ladder would be furnished for use in performing the work. When the plaintiff arrived at the pavilion for work in the early morning of July 10th he found the ladder among the equipment that had been delivered there for use of the workers in preparing the pavilion for the reception. There was only this one ladder. The plaintiff had never used it and knew nothing about it except that he had seen it in the property room or cloak room in the Temple. Nothing was said to him about the condition of the ladder or anything to indicate there was any defect in it. The testimony of the officers of the defendant, however, indicate that they were familiar with the general characteristics of the ladder gathered from their experience throughout the years and had formed judgment as to its fitness for the work for which it was to be used and was being used by the plaintiff at the time of the accident. Pierce, the Potentate, testified that the ladder was "flimsy, rickety, and wobbly," and that after the accident he told the plaintiff on one or two occasions that the ladder was so unsafe it should never have been sent out to the pavilion at all. McIver, the stage director, testified that the ladder was rickety, that the joints were loose and that it would "wiggle when you got near the top." Hiler who had donated the ladder to the defendant and who at one time served as stage director testified that he found it necessary to repair the ladder by renailing the steps, that is, fastening them with nails or screws; that the ladder was of light construction and made of soft wood; that he did not know when the steps in the ladder were renailed last before the accident. He testified that if you got up on the ladder and moved around it would sway; that it "wasn't good to get up to the top and reach over three or four feet to calcimine or paint or anything of that sort;" that the ladder was unsafe for any such work. The testimony does not indicate that there was anything in the appearance of

the ladder which from ordinary observation or visual inspection would indicate any particular weakness. The characteristics which the officers (and a former officer) of the defendant mentioned in the testimony were not such as would appear by an ordinary visual observation. Thus, they would hardly have ascertained by merely looking at the ladder that it was wobbly; that the joints were loose and squeaked when you walked on it, and the ladder would wiggle when you got near the top. Such statements indicate that the information of the witnesses had been obtained either through use of the ladder or at least by observance of the ladder while it was being used by others. The testimony of these witnesses show that there was a likelihood, or at least a strong possibility, that there might be some defect in the ladder which would make it dangerous to attempt to use it in its then condition to ascend to the higher steps which would be necessary to enable the worker to place decorations on the wire. The testimony shows that some of the witnesses considered the ladder unsafe. Yet there was no examination or inspection by the representatives of the defendant or any attempt to check up on the condition of the ladder before it was furnished to the plaintiff for use at the pavilion. The plaintiff had never used the ladder. He recognized it as a ladder belonging to the defendant and he knew that they had kept it in the Temple for the use of the defendant. He naturally would assume that it was safe and that the defendant would not have furnished a ladder which it had any reason to believe to be unsafe. The plaintiff was not charged with the duty of inspecting the ladder for the purpose of finding hidden or latent defects. This was the duty of the employer. 56 C. J. S. p 1188; 4 Labatt's Master and Servant, 2d ed., Sec 1331, p 3800 et seq. The plaintiff had the right to assume that the defendant and its officers had used due care to furnish him with a reasonably safe ladder and that they would not furnish him with a ladder about the safety of which they had any reasonable doubt. He had a right to enter upon the labor which he had promised to perform in full reliance that the defendant and its executives had exercised due care for his safety and that the ladder belonging to the defendant which they had furnished for his use was a safe and

proper tool. Fishburn v. International Harvester Co., supra; 35 Am Jur, Master and Servant, pp 604–605; 56 CJS p 1187, et seq.; 4 Labatt's Master and Servant, 2d ed p 3802 et seq.; DeMoss v. G. N. Ry. Co., 67 ND 412, 422, 272 NW 506, 510.

The risks which an employee assumes are the usual and ordinary risks of the particular employment, but not risks which are due to the employer's negligence. DeMoss v. G. N. Ry. Co., supra; 56 CJS pp 1161, 1165. "It is a general rule that a servant does not assume risks arising from the negligence of the master." 56 CJS p 1161, Sec 362. "Generally a servant does not assume the risk of injury from the negligent failure of the master to furnish him with reasonably safe machinery, tools, or appliances for the prosecution of the work he is employed to do." 56 CJS p 1165, Sec 364.

In DeMoss v. G. N. Ry. Co., supra, this court said:

"The risks which the employee assumes are merely the usual and ordinary risks of his particular employment, those risks which are incident to the employment when they are not due to the master's negligence. Louisville & N. R. Co. v. Wright, 202 Ala 255, 80 So 93. They are such dangers as ordinarily, commonly, and usually pertain to or are incident to the employment which a reasonably prudent person might anticipate and do not include danger by acts of negligence on the part of the employer. Chicago, R. I. & P. R. Co. v. Smith (Tex Civ App) 197 SW 614, affirmed in (Tex Com App) 222 SW 1099. He has the right to assume that his employer will exercise proper care. Fox v. Lehigh Valley R. Co. 292 Pa 321, 141 A 157. He is not to be treated as assuming a risk that is attributable to the employer's negligence until he becomes aware of it, or it is so plainly observable that he must be presumed to have known of it, and he continues to work without complaint. . . .

" 'Extraordinary risks created by the master's negligence will not defeat a recovery even if the servant knows of them, unless the danger is so obvious and imminent that he cannot help seeing and understanding it, and he fails under the circumstances to exercise the care of an ordinarily prudent man.' Strunke v. Payne, 184 NC 582, 114 SE 840." 67 ND at p 423, 272 NW at p 510.

The defects in the ladder which caused plaintiff's injury were not obvious and were not ascertainable by ordinary observation. The witnesses who observed the ladder do not claim that from their observation they could or did see or ascertain that the step was defective or that it was loose and "turned in the groove." The plaintiff did not fall because the step broke but because it tilted. The witness Steenerson testified that when he picked up the ladder after the accident had happened he grabbed ahold of it "by one step up towards the top" and that he found it was loose; that he "wouldn't say it was so loose you could shake it" but it was loose so you could tilt it back and forth (and he demonstrated to the jury what he meant by this). The step was still in place and it was only after he took ahold of it that he found it would tip, but that it was not loose so that the looseness would become apparent by shaking the ladder. The plaintiff, however, did more than merely look at the ladder. After fastening the brace at the top so as to lock the ladder, he raised it and placed it on its four legs and then shook it to see that it was solid. After examination and observation so made the plaintiff concluded that the ladder was safe and proceeded to use it and found it to be safe for the work he was doing, until he found it necessary to ascend to the height where the defective step was encountered.

In my opinion there was ample evidence in this case from which the jury could find that plaintiff's injuries were the direct result of defendant's negligence; that plaintiff was not guilty of contributory negligence and did not assume the risk of injury. In short, I believe that the verdict is well sustained by evidence.

BRODERICK, District Judge, dissenting.

I desire to respectfully dissent from the conclusion arrived at by the Court in its majority opinion. While it is no doubt true as an abstract statement of law that "Notwithstanding some rulings in a few cases to the contrary, the great weight of authority is to the effect that a small portable stepladder is a simple tool or appliance" and it is also true that: "Where a tool or appliance is simple in construction and a defect therein is discernible without special skill or knowledge and the employee

is as well qualified as the employer to detect the defect and appraise the danger resulting therefrom, the employee may not recover damages from his employer for an injury due to such defect that is unknown to the employer.", however that rule is subject to various qualifications and modifications which the majority of the court have not taken into consideration and applied to the facts in their decision of this case. That principle of law is not applicable to even simple tools when the master or employer has actual knowledge of the unsafe and defective condition of even a simple tool and the servant or employee does not have any knowledge of the unsafe or defective condition of the tool or appliance.

In this case the majority of the Court are holding that "The statutory provision that 'An employer, in all cases shall indemnify his employee for losses caused by the former's want of ordinary care.' (Sec 34–0203 RCND 1943) is applicable in the case of a gratuitous employee as well as an employee for reward, and in determining the employer's liability the same rule applies as in the case of master and servant." I agree with that statement of law as set out in Syllabus No. 2 of the majority opinion.

The uncontradicted testimony of A. H. Pierce, the Chief Rabban of Kem Temple, L. B. Hiler, former stage director and John McIver, who testified he was stage director of Kem Temple at the time of the accident, show conclusively that the defendant and its officers and agents were guilty of negligence in that they furnished the plaintiff, Frank Olson, who was a gratuitous employee of Kem Temple, with this long, fourteen foot stepladder which was in an unsafe and defective condition at the time they furnished the stepladder to the plaintiff and that they had knowledge of the fact that it was in a defective and unsafe condition for a long time prior to the date of the accident in question. The testimony further shows that they had knowledge of the fact that such stepladder was a second hand stepladder when they received it; that it had been in their possession for at least fifteen years prior to the accident, during which time it had become out of repair, and that it had been repaired at least once prior to

the date of the accident and had been repaired at least once by tightening the screws and nails in the rungs of the ladder.

Mr. A. H. Pierce, the Chief Rabban, was called as a witness by the plaintiff and testified as follows: (Page 76 of the official reporter's transcript.)

Q I will ask you whether or not in your visits to Mr. Olson at the hospital on one or two occasions you told him that this ladder was so unsafe it should never have been sent out to the pavilion at all?

A Yes.

Q You told him that?

A Yes.

Mr. Pierce, as Chief Rabban of Kem Temple, was the person in general charge of the general activities of the temple in preparing for their various social events and was in general charge of the preparations for the reception that was to be held on this particular occasion. He would be in the same position as the General Foreman on a construction crew and certainly if such a General Foreman made an admission that a ladder or other appliance was furnished to an employee in a defective condition, such an admission would be binding upon his principal and the admission of the Chief Rabban, in this case, that the ladder was in a defective condition when it was furnished to the plaintiff, would be binding on Kem Temple and would show knowledge on the part of the employer that it was aware of such defective condition. That being the case the jury had a perfect right to take that admission into consideration in arriving at their verdict in the case and would have the right to draw the reasonable inference from such admission that the officers of Kem Temple had knowledge of the defective condition of the ladder prior to the accident. The same witness, A. H. Pierce, Chief Rabban, was called as a witness for the defendant and at page 187 of the official transcript testified as follows:

A Well it was a flimsy rickety ladder. That is the only way you can describe it.

Q And was that the condition of it over those 15 to 16 years you knew it?

A At least the last ten years.

Q Do you know whether or not any repairs were ever made on that ladder?

A Not that I know of.

In view of the fact that he was called as a witness for the defendant, the attorney for the defendant had a full opportunity to explain or modify the statement that he had made to Mr. Olson in the hospital, but no modification, or further explanation of that statement, was made and it therefore stands as the uncontradicted testimony in the case, that the ladder was in a defective condition at the time it was furnished to Mr. Olson, of which fact he, as an officer of the Temple, had full knowledge and on that testimony alone the jury would be justified in arriving at the conclusion that the defendant was guilty of negligence.

L. B. Hiler was called as a witness for the Plaintiff and testified on page 77 of the transcript that he had been stage director of Kem Temple for fourteen years; that the ladder in question was obtained by the lodge in 1941; that it was an old ladder at the time they obtained it; that he had tightened the screws and nails; that it was not too bad, but it was rickety, "as Mr. McIver said a while ago." If you got up and moved around on it, it would sway, etc.

Q Was the ladder unsafe for that work?

A Yes, it was high, etc.

Q Do you know whether or not all the cross braces were on the ladder?

A No, they were not, the bottom one was gone. It was broken out. I guess it was gone all the time they had it. (Page 81) The brace was off for many years. (Page 83) It was a second hand ladder when he gave it to us.

Mr. John McIver was called as a witness for the Plaintiff and testified that his position was officially known as the Stage Director. He testified: "I have twenty-four men in my group and we handle all stage and dining room or ball room and electrical effects."

Q How long had you been familiar with the ladder prior to that time approximately? (Page 69)

A Fifteen years.

Q What was the condition of that ladder?

A It had been in use for a long time and it was what we call, rickety.

There was also some testimony by one Clyde Steenerson as to the unsafe condition of the ladder, but he was testifying to the condition of the ladder after the accident. He had never used it prior to that time but said he saw it around in the cloakroom of the Temple but never made any special examination of it. However, his testimony in no manner negatives or contradicts the testimony of the other witnesses who had seen and used the ladder prior to the accident and knew of its defective condition.

In view of the uncontradicted testimony there is conclusive proof that the ladder was old, weak, rickety, defective and unsafe at the time of the accident and that such fact was known to the defendant, its officers and agents in charge of the work. It therefore follows that the defendant and its agents were negligent in that they had neglected to use ordinary care for the protection of the plaintiff.

"It is the master's duty not only to provide proper appliances for the use of his employees, but also to exercise ordinary care to keep the appliances in good repair."

The master's duty to provide proper appliances and to keep them in good repair cannot be delegated so as to avoid personal responsibility for the due performance of that duty

The employee does not assume the risk of injury caused by the master's negligence, where he had no knowledge of the existing danger. Meehan v. G. N. Ry. Co. 13 ND 432, 101 NW 183.

"The simple tool doctrine has no application where the tool inflicting the injury was being used by another than the injured servant, especially where it is not being used in the ordinary way, or where the master had actual knowledge of the defect and the employee had not. Further it has been held that the 'simple tool doctrine' is inapplicable where the defect in the tool was not observable or discoverable by inspection such as a workman using it could reasonably be expected to make."

Southern Ry. Co. v. Cowan, 138 SE 331, 334, 52 Ga App 360, 39 Corpus Juris 763, Note 72.

"Simple Tool doctrine has no application where the master had actual knowledge of the defect and the employee had not. (Note 72) Arenson v. Smith, 120 Wash 98, 206 P 960; Randal v. Gerrick, 104 Wash 422, 176 P 675; Stork v. Chas. Stolper Cooperage Co. 127 Wis 318, 106 NW 841, 7 Ann Cas 339.

"A defect in a ladder, arising from age or decay, might not be discoverable by such inspection as a workman is expected to make, and might be upon more careful examination. . . . And we think it was fairly open to the jury to find that the defective condition of the round might have been discovered had it been suitably inspected; not, perhaps, by such an inspection as would naturally be given to it by the workman upon it, whose duty it was to work, not to inspect, and who might lawfully rely upon the presumption that the master had performed its duty, but by such an inspection on the part of the master as reasonably would be necessary to make sure that an appliance upon which the servant was to risk his life or limb every time he used it was reasonably safe." Twombly v. Consolidated Electric, 98 Me 353, 64 LRA 551.

It is my opinion that the above statement of law is especially applicable to the facts in this case, where the evidence shows that the officers of the Temple were in the habit of calling upon its members from all walks of life who were not accustomed to such work, to use such stepladders in carrying on the activities of the Temple. This is especially true in this case where it is an admitted fact, uncontradicted by any testimony whatsoever, that the ladder was old and rickety, had been in use in and around the lodge for at least fifteen years, was a second hand ladder when they obtained it and especially so in view of the testimony of the Chief Rabban that the ladder was defective and never should have been sent out there for the work they were about to do.

In the case of Phillip Carey Roofing Company v. Black, 129 Tenn 30, 164 SW 1183, 51 LRA NS 340, the Court said,

"The general presumption is that a master is bound to inspect

tools or appliances furnished by him to a workman, and to keep them in sufficient repair. If however, the tools or appliances are common or simple tools, there is an exception to the general rule. The presumption in such cases is that the servant is equally conversant with the nature of such simple or common tools, and is in as good a position as the master to discover any defects therein. . . . *The foundation of the simple tool doctrine is the assumption that the knowledge of the master and servant must be equal. Such a presumption cannot be indulged where the master has actual notice of a defect, where the proof shows his knowledge is superior. If the master is, as a matter of fact, cognizant that a tool which he furnishes an employee is in such a condition as to render its use by the employee dangerous to the latter, he will be liable for an injury sustained by the employee in the use of such an implement where the defect is not known to the employee, and is not of such a nature as to be discovered by that observation which would naturally accompany its use.* Guthrie v. L. & N. Ry. Co., 11 Lea 372, 47 Am Rep 286; Stork v. Chas. Stolper Cooperage Co., 127 Wis 318, 106 NW 841, 7 Ann Cas 339; Mercer v. Atlantic Coast Line Ry. Co., 153 NC 399, 70 SE 742, Ann Cas 1912A, 1002, 2 NCCA 118. *In the latter case it is apparently held that the duty of a master to exercise ordinary care to furnish reasonably proper tools to his servants applies to simple as well as complicated, tools, and the rule is relaxed only as to the duty of inspection thereafter. Although the master is not required to inspect simple tools previously furnished to the employee, to discover defects of which the employee using such implements should be aware, and although generally no inspection of a simple tool may be necessary at the time it is delivered to an employee, yet if the master furnishes such a tool, with a dangerous defect of which he has actual knowledge he is negligent. He should not be permitted to expose the servant to such a risk particularly if the defect is of such a character that it might be overlooked by the servant.*"

In the case of Stork v. Charles Stolper Cooperage Co., supra, the Supreme Court of Wisconsin held: Syllabus 2.

"The rule that a master is not liable for injuries resulting from defects in 'very simple tools' has no application *where*

*the master has actual knowledge of the defect and the employee has not."*

See the discussion of the rule and its exceptions starting on page 842 and going through the first column on page 843.

Most of the cases cited by Judge Morris in the majority opinion are from Minnesota and Michigan which recognizes the so-called "simple tool doctrine." In the very late case of Person v. Okes, 29 NW2d 361, which is cited by Judge Morris, the Court held: (Syllabus 1.) (By the Court)

"The simple tool doctrine, under which a master is under no duty to inspect and discover defects, if any, in simple tools and instrumentalities the use of which is attended ordinarily with no danger and to warn his servant thereof, has no application where the master has knowledge of the defect and the servant does not and where the defect is of such a character as not to be obvious from observation ordinarily accompanying its use. Stork v. Charles Stolper Cooperage Co., (supra) 7 Ann Cas 339. In the Stork case the Court said 127 Wis at page 322, 106 NW at page 843, 7 Ann Cas 339: ". . . As stated above, the relaxation of the master's duty and liability rests on the assumed equality of knowledge and ability to discover the defect complained of. It can have no application to a defect of which the master is actually cognizant, and which, as a reasonable man, he should appreciate is likely to result in injury to one using the implement, as it is likely to be used, and which is neither known to the employee nor of such a character as to be obvious to that observation which may be expected to accompany its use. In such case the general rule of negligence as above stated is fully effective, and the master who knowingly and negligently exposes his employee to a peril unknown to the latter must respond for the damage which results."

Syllabus (5, 6) 3. (Person v. Okes)

*"The applicability of the simple tool doctrine to the instant case depends on whether defendants knew of the alleged defect before plaintiff used the stool and possessing such knowledge, failed to warn her of that fact. If the answer to this question is in the affirmative, the case does not come within the rule, and if the answer is in the negative it does.* We think the answer

(under the fact) must be in the negative. . . . She testified that the stool was in "perfect condition" and that she discarded it for the reason already mentioned, which was other than for a defect therein. *Her uncontradicted and unimpeached evidence is to the contrary."*

In the case at bar the uncontradicted and unimpeached testimony is directly to the contrary, the evidence showing both the defective condition of the ladder and the knowledge on the part of the employer.

In the case of Nichols v. Bush, 289 NW 219, 291 Mich 473, which is also cited by the court in its majority opinion, the Supreme Court of Michigan indicated that it would follow the same rule as stated in the case of Person v. Okes, supra, and the case of Stork v. Chas. Stolper Cooperage Co., supra. By referring to Syllabus #8 we find it reads as follows:

"In an action by household servant against employers to recover for injuries suffered from fall from ladder, reviewing court on appeal from a verdict directed for employers was not required to consider the effect of an alleged admission by employers that ladder was unsafe where evidence failed to establish that fall resulted from defective condition of ladder."

In connection with that phase of the case the Court said: Syllabus (7, 8)

"We do not overlook the claim of plaintiff that the defendant Harriet Bush stated to the plaintiff after the accident: 'Didn't you know that was "unsafe",' which must be accepted as true in view of no contradictory testimony, and the direction of the verdict against the plaintiff. By such claim, it is sought to establish defendant's negligence on the ground that it was an admission on plaintiff's part that the ladder was unsafe and that defendants had knowledge of this fact. In view of the foregoing disposition, however, it is unnecessary to consider this phase of the case."

*The admissions of the unsafe condition of the ladder by the defendants in the case at bar are unimpeached, unqualified and uncontradicted.* As a matter of fact the defendants in their side of the case confirmed the fact that the ladder was unsafe.

I desire to call attention to the fact that both the Michigan and the Minnesota courts are courts which hold to the doctrine of the simple tool, but certainly these cases also indicate that if the Master has knowledge of the defects and the employee does not, that the Master is liable in damages, even if it is a simple tool.

In 35 American Jurisprudence at Pages 143, 573, 574, it is stated that the simple tool doctrine is subject to various modifications: "Again a case for recovery is presented where the evidence shows that whereas the employee did not know of the defective condition of the offending tool, the employer did have actual knowledge thereof." This statement is quoted in the case of Fishburn v. I. H. Co. 138 P2d 471.

In the case of Ft. Smith & W. Ry. Co. v. Holcombe, 158 P 633, LRA 1916F, 1237, the Court held:

"Where a simple tool becomes defective and the master has actual notice of such defect, and the servant injured had no knowledge of such defect, and injury results from the use of such tool by a fellow servant, the master is liable."

In that case they quote the Stork case, and also the case of Savannah Ry. Co. v. Pughsley, 113 Ga 1012, 39 So 473, which holds to the same effect.

In view of the fact that the undisputed, unimpeached testimony in the case shows that the defendant furnished the plaintiff with a defective stepladder, with knowledge on the part of the defendant and its agents that the same was defective, and the law applicable to such a situation, the writer is of the opinion that the action of the trial judge in setting aside the jury's verdict in favor of the plaintiff and the granting of the defendant's motion for a new trial, was contrary to law and not warranted by the evidence; that the trial judge in doing so invaded the province of the jury as the trier of facts, and that it was an absolute abuse of discretion.

Section 28–1902 sets out the different causes for which a verdict may be vacated and a new trial granted, and the only purported grounds for the granting of a new trial in this case is as stated by the Court in its majority opinion, viz: "The trial

court granted the motion for a new trial on the ground that the evidence is insufficient to support the verdict in that the evidence does not show that the defendant was negligent or that the plaintiff was free from contributory negligence."

However, the Trial Court amplified and explained that statement by saying that there was no evidence to show that the defendant had any knowledge of the defective ladder and by making the further statement that the plaintiff made no inspection of the ladder. A reading of the transcript of the evidence clearly indicates that the testimony is to the contrary. I have heretofore set out the testimony showing that the defendant had knowledge of the defective ladder. With reference to the statement that the plaintiff made no inspection or test of the ladder, the following excerpts from the official reporter's transcript shows that he did make an inspection and test of the ladder:

Page 48.

Q You know that the ladder was a very old ladder?

A I could not testify to that. I had not used it before. I had seen it in the cloakroom.

Q Did you look over the ladder and make an inspection of it at the time you set it up?

A I shook it to see if it was solid and I pulled down the braces.

Q Did you make any further inspection of it?

A No, except what I could see. In my own mind I thought it was rigid enough to climb it.

Q How about the rungs of the ladder?

A Those I used until I got to the center were solid.

Page 50.

Q Had you noticed any of the rungs of the ladder weak or weakening or anything?

A No, I had not.

Q And you made no inspection of the rungs of the ladder above where you had already stepped?

A Not above where I had already stepped. My examination of the ladder when I set it up for using it, I made sure that the

center part was down, and I shook it to be sure it was balanced and all four legs on the floor.

Then as to the cause of the accident, the testimony of the plaintiff was as follows:

Page 11.

A. And then as I mentioned, I had occasion to get up a little higher to fasten the streamers, and the step turned on me and caused me to lose my balance.

Page 12.

A When I took the other step up there the step turned and caused me to lose my balance and fall.

CROSS EXAMINATION:

Q That ladder has been around there for a long time?

A I presume it has.

Q For how many years?

A That I would not know.

Q And the ladder was used when needed by the various Masonic organizations from time to time?

A I would not know.

Q And as the ladder you had used before?

A I had not used it before. I just saw it in the cloakroom upstairs.

As the foregoing testimony indicates the plaintiff made an examination and inspection of the ladder. As to whether or not he made such an inspection of the ladder as would naturally be given to it by the workmen upon it, and whose duty it was to work, not to inspect, and who might lawfully rely on the presumption that the master had performed his duty was certainly a question of fact to be determined and taken into consideration by the jury, and it must be assumed that the jury took that fact into consideration and no doubt did, in arriving at their verdict in this case. Questions of negligence and contributory negligence are questions of fact to be determined by the jury from the evidence in the case.

As stated in the case of Missouri Pacific Railroad Co. v. Spangler, 140 F2d 917,

"It was for the jury to decide whether such general observa-

tions or inspection as the employee reasonably and practically could have been expected to make in the conditions and situation would have detected the defect and the danger. If it would not then the employee's failure to inspect was not contributory negligence."

The verdict is fully and amply supported by the evidence and affirmatively shows that the defendant was negligent and that the plaintiff was free from contributory negligence, and the jury on the undisputed evidence so found and it was clearly warranted in such finding. There being uncontradicted testimony that the defendant was guilty of negligence in the furnishing of a stepladder to the plaintiff with knowledge of the fact that it was defective, the issue was plainly one for the jury, and the jury alone, to determine and not the trial judge. By attempting to do so he was invading the province of the jury. The jury was the sole and exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony.

With reference to the alleged grounds stated by the trial court as a basis for setting aside the verdict in this case and granting a new trial, I desire to quote from a prior decision of this court in the case of Kohlman v. Hyland, 56 ND 772, 219 NW 228. In that case this court held,

Syllabus 1. "In an appellate court orders granting new trials stand upon a firmer foundation than orders denying a new trial."

Syllabus 1. *"A motion for a new trial on the grounds of insufficiency of the evidence to support the verdict invokes the discretion of the trial judge, but the discretion is a legal discretion to be exercised in the interests of justice, and where the motion is granted, it must appear that the alleged cause or ground had an actual existence."*

Syllabus 3. . . . *"Since the facts from which the inference of negligent driving may be drawn do not rest upon conflicting evidence, and since the inference is one that is clearly warranted, the Court, in ruling upon a motion for a new trial, was not exercising a discretionary power and it was error to grant the motion."*

It seems to me that this is the exact and precise situation

that obtains in this case. The testimony as to the defendant's negligence does not rest on conflicting testimony and the inference is one that is clearly drawn, and no doubt was drawn by the jury. There is a very able discussion of this subject in the opinion written by Justice Birdzell in this case, concurred in by Chief Justice Nuessle and Justice Christianson. In that case, commencing on page 777 of 56 North Dakota, the court said,

"Orders granting new trials stand on a firmer foundation in an appellate court than orders denying them. (citing numerous cases). A motion for a new trial on the ground of the insufficiency of the evidence to support the verdict, nevertheless, invokes the discretion of the trial court; but this is a legal and not an arbitrary discretion. As was said by this court in an early case, referring to the statutory provision authorizing the granting of new trials on discretionary grounds (Braithwaite v. Aiken, 2 ND 57, 64, 49 NW 419): "This clearly indicates that the trial judge who grants a new trial must act, not arbitrarily, but upon facts showing a legal ground for a new trial." And, to the same effect are the cases supra, as well as many others that need not be cited. Perhaps the best guide for an appellate court in determining whether or not the trial court has erred in granting or denying a motion for a new trial on a discretionary ground is that suggested in the Colorado case of Clifford v. Denver, S. P. & P. R. Co. 12 Colo 128, 20 P 333, at page 335 (partially quoted with approval in 1 Spelling, New Tr. & App. Pr. Par. 237): "Trial courts may certainly exercise a reasonable discretion in granting new trials, when discretionary grounds exist and are relied on by the applicants. *It seems to us, however, that, if the rule of practice concerning judicial discretion be as broad as contended for by appellee's counsel, a statute authorizing an appeal from such an order is of little practical effect, for the exercise of judicial discretion would render it a dead letter. In order to give it reasonable effect, trial courts must be required to make correct rulings on legal propositions.* Where the ground of the application is insufficiency of the evidence to support the verdict; that the verdict is against the weight of the evidence; that it is unjust and

inequitable, and the like, . . . a reasonable degree of discretion exists to allow or deny a new trial; and when the questions involved in the application are close, the ruling of the court should not be interfered with. On the other hand, if the ground of the motion relied on does not in fact exist, or does not constitute a legal ground for a new trial, or the necessity for the application is the result of the applicant's negligence, the motion should be denied, or the ruling held to be erroneous.

"The discretion vested in the trial court to grant or refuse a new trial is neither an arbitrary nor a general discretion. It is based on the theory that the judge who tries a case, having the parties, their witnesses and counsel, before him, with opportunity to observe their demeanor and conduct during the trial, and to note all incidents occurring during its progress likely to affect the result thereof, is better qualified to judge whether a fair trial has been had, and substantial justice done, than the appellate tribunal. *But the fact that the legislative assembly passed a law giving the right of appeal from such orders indicates a purpose to restrict the rulings upon the subject to the application of legal principles.*

"The general rule, so often announced, that a stronger presumption obtains in favor of an order granting, than one denying, a new trial, is urged in the present case as a strong reason why the ruling should not be disturbed. This rule should also be limited to cases wherein the ground on which the new trial was granted constitutes a legal ground for such order, and the alleged causes have an actual existence."

It was said by Lord Mansfield in Rex v. Wilkes, 4 Burr. 2527, 98 Eng Reprint, 327–334:

"But discretion when applied to a court of justice, means sound discretion guided by law. It must be governed by rule not by humor; it must not be arbitrary, vague and fanciful; but legal and regular."

2 Hayne, New Tr. & App. Rev. ed. Par 289.

The discretion of the trial court should be exercised in all cases in the interest of justice and where it appears to the judge that the verdict is against the weight of the evidence it is his

imperative duty to set it aside. State v. Stepp, 48 ND 566, 185 NW 812; State v. Weber, 49 ND 325, 191 NW 610; Kansas P. R. Co. v. Kunkel, 17 Kan 145, 3 Am Neg Cas 412. "We do not mean," says Justice Brewer in the Kansas case, supra, at page 172, "that he is to substitute his own judgment in all cases for the judgment of the jury, for it is their province to settle questions of fact; and when the evidence is nearly balanced, or is such that different minds would naturally and fairly come to different conclusions thereon, he has no right to disturb the findings of the jury, although his own judgment might incline him the other way. In other words, the finding of the jury is to be upheld by him as against any mere doubts of its correctness. But when his judgment tells him it is wrong, that whether from mistake, or prejudice, or other cause, the jury have erred, and found against the fair preponderance of the evidence, then no duty is more imperative than that of setting aside the verdict, and remanding the question to another jury."

"While a failure to exercise a discretion that is within the power of the court to exercise is ground for reversal, the wrongful exercise, is equally so, particularly where, as here, discretionary orders are rendered appealable by statute. Olson v. Riddle, 22 ND 144, 132 NW 655. "A test of what is within the discretion of a court has been suggested by the question, May the court properly decide the point either way? If not, then there is no discretion to exercise. If there is no latitude for the exercise of the power, it cannot be said that the power is discretionary." 2 Hayne, New Tr. & App. Rev. ed. Par 289. These principles have found general recognition in this state in a long line of cases from Braithwaite v. Aiken, supra, to Martin v. Parkins, 55 ND 339, 213 NW 574. In the light of these principles we are compelled to examine the record before us to determine whether or not the trial court erred in granting the motion for a new trial."

To the same effect is the decision of the Supreme Court of Wisconsin in the case of McCarthy v. Thompson, 40 NW2d 560, syllabus number two: See Beattie v. Strasser, 2 NW2d 713.

"Where reasons set forth by trial judge as prompting him to make order granting plaintiff a new trial after verdict for defendants, were not warranted by the evidence, the trial judge abused his discretion and Supreme Court on appeal would reverse order and remand the cause with directions to reinstate the verdict and enter judgment for defendants."

See also the case of De Vere v. Parten (Minnesota) 23 NW2d 584 Syllabus 2.

"Where verdict is the only one warranted under the law and by the evidence, error in charge and misconduct of counsel . . . are harmless and not ground for new trial.

In the case of Gordon v. Pappas, Minn., 34 NW2d 293, the Supreme Court of Minnesota held, Syllabus 4:

"If verdict is right as a matter of law, there will be no reversal on ground of erroneous instructions nor on ground of erroneous rulings, if those rulings do not affect the correctness of the verdict."

Syllabus 5:

"Where verdict for plaintiff was right as a matter of law, error, if any, in charge relating to liability of defendant was not ground for new trial."

This is not a case where there is any claim or evidence upon the part of the defendant that the verdict is excessive or that it was arrived at by passion or prejudice. If there was any error in the instructions to the jury as to the liability of the defendant in this case it was error in favor of the defendant and prejudicial to the plaintiff.

As stated by this court in many cases, including the cases of Horton v. Wright, Barrett & Stilwell Co., 43 ND 114, 174 NW 67, and Otter Tail Power Co. v. Von Bank, 72 ND 497, 8 NW2d 599, there should be some stability to decisions of the Supreme Court and they should not be subject to constant fluctuation. If the principles of law and procedure announced by the court and set out in syllabus numbers two and three in the case of Kohlman v. Hyland, supra, for the guidance of attorneys and trial judges, were sound law and were applicable to the facts in that case, they are equally applicable to the facts in the case at bar.

It was a question of fact for the jury to determine whether the act of the defendant and its officers constituted negligence, and it was also a question of fact for the jury to determine whether or not there was any contributory negligence on the part of the defendant.

One of the alleged grounds or reasons that the trial court assigned for setting aside the verdict and granting a new trial was that the evidence does not show that the plaintiff was free from contributory negligence. Of course the burden is upon the defendant to allege and prove contributory negligence. The trial court was evidently acting under the assumption that it was incumbent upon the plaintiff to prove that he was free from contributory negligence. As stated in the case of Twombly v. Consolidated Electric Co., 98 Me 353, 64 LRA 551, supra, the question of whether or not the defects in the ladder could be discovered by such an examination as the plaintiff would be reasonably expected to make under the circumstances was a matter for the jury to determine from the evidence in the case. That is certainly a question of fact upon which reasonable men might differ and the trial court had no authority to invade the province of the jury or to substitute his judgment for that of the jury on that question.

"The Supreme Court in reviewing the record in an action at law may not resolve conflicts or weigh evidence. Presumably all controverted facts in an action at law are resolved by the jury in favor of successful party. A jury's findings, based on conflicting evidence in an action at law, will not be disturbed on appeal unless clearly wrong. In testing the sufficiency of the evidence to support the verdict, it must be considered in the light most favorable to the successful party, and any controverted fact must be resolved in his favor, and he must be given the advantage of any inference that can be drawn therefrom. It is not permissible for this court in reviewing the record in an action at law to resolve or weigh the evidence." Bolio v. Scholting, 41 NW2d 913.

In a very recent decision of the Supreme Court of this State

in the case of Grant v. Jacobs, 32 NW2d 881, at page 886, the court held:

"The jurors were the judges of all questions of fact in the case. To the jury belongs the duty of weighing the evidence under the Court's instructions and of determining the credibility of the witnesses. The trial judge correctly refused to invade the province of the jury."

In the case of Schnell v. Northern Pacific Ry. Co., 71 ND 369, 1 NW2d 56, this court said that while the granting of a new trial rests in the sound discretion of the trial judge, they further said that such discretion is a legal discretion to be exercised in the interests of justice, and if it appears that the party making the motion has not made a case and there is no reasonable probability that on a new trial he can make a case, an order granting a new trial will not be sustained. The court further said in that case:

"(4) Of course the burden of establishing contributory negligence in cases such as the instant case is on the defendant."

"As to whether or not there is contributory negligence is ordinarily a matter of fact to be determined by the jury. It is only when the evidence is such that reasonable minds must conclude that the plaintiff did not act with due care for his own safety that the question ceases to be one for the jury."

In the case of Gunder v. Feland, 51 ND 785, 200 NW 909, opinion by Judge Nuessle, the Supreme Court of North Dakota held:

"Where the evidence is in conflict and reasonable men might draw different conclusions therefrom neither the verdict of the jury based on such evidence, nor the order of the trial court denying a motion for a new trial will be disturbed on appeal when the sole ground of attack is that the evidence is insufficient to sustain the verdict."

The Court further said:

"However, the issue of fact, as thus made, was for the determination of the jury. They saw, as well as heard, the witnesses who testified. It was for them to say where the truth lay, and their verdict comes to this court clothed with every presumption

in its favor. Erickson v. Wiper, 33 ND 193, 157 NW 592; Thompson v. Scott, 34 ND 503, 159 NW 21; Jensen v. Clausen, 34 ND 637, 159 NW 30. . . . Where the evidence is in conflict and reasonable men might draw different conclusions therefrom, this court on appeal will disturb neither the verdict of the jury based on such evidence nor the order of the trial court denying a motion for a new trial where the sole ground of attack is that the evidence is insufficient to sustain the verdict. Grewer v. Shafer, 50 ND 672, 197 NW 596, and cases cited."

In the recent case of Ferderer v. N. P. Ry. Co., ante 169, 42 NW2d 217, the court held that,

"Where the sufficiency of the evidence to warrant a finding of negligence by the jury is challenged all reasonable intendments insofar as the evidence is concerned must be resolved in favor of the verdict."

Chief Justice Nuessle states in his opinion: "The established rule in this state is that whether a motion for a new trial shall be granted or denied is largely discretionary with the trial Judge, and unless there is a manifest abuse of discretion on his part, his order denying it will not be disturbed. And this is particularly true when a new trial is granted. In fact in some jurisdictions an order granting a new trial is not appealable." That last statement may be true, but it certainly has no bearing on the situation in this case or in this state. In the case of Kohlman v. Hyland, 56 ND 772, 219 NW 298, this court in its opinion, concurred in by Chief Justice Nuessle, held: "A motion for a new trial on the grounds of insufficiency of the evidence to support a verdict invokes the discretion of the trial judge, but the discretion is a legal discretion to be exercised in the interests of justice, and where the motion is granted, it must appear that the alleged cause or ground has an actual existence."

The Court in that case further went on to say: "It seems to us, however, that, if the rule of practice concerning judicial discretion be as broad as contended for by appellee's counsel (or as contended for by Judge Nuessle in this case) a statute author-

izing an appeal from such an order is of little practical effect, for the exercise of judicial discretion would render it a dead letter. *In order to give it reasonable effect Trial Courts must be required to make correct rulings on legal propositions.*" "*The discretion vested in the trial court to grant or refuse a new trial is neither an arbitrary nor a general discretion.*" . . . "*But the fact that the legislative assembly passed a law giving the right of appeal from such order indicates a purpose to restrict the rulings upon the subject to the application of legal principles.*" . . . "*This rule should also be limited to cases wherein the ground on which the new trial was granted constituted a legal ground for such order and the alleged causes have an actual existence.*" "*But discretion, when applied to a court of justice, means sound discretion guided by law.* It must be governed by rule NOT BY HUMOR; IT MUST NOT BE ARBITRARY, vague and FANCIFUL; but legal and regular."

The Chief Justice further states in his opinion: "The Plaintiff was a member of the defendant organization. He volunteered his services. He was acting under no compulsion." Of course the testimony of the officers of the lodge shows that he was not a volunteer in the legal sense. He was asked by the Chief Rabban of the Lodge to assist with the work, and was a member of the Stage Director's crew in doing that work. In the case of Hitchcock v. Arctic Creamery Co., 170 Iowa 352, 150 NW 731, the Supreme Court of Iowa quoted from the case of Johnson v. Ashland Water Co., 71 Wis 553, 37 NW 823, 5 Am St Rep 243, as follows:

"Under the allegations of the complaint, the plaintiff was engaged in the defendant's work at the request of the man in charge of the work; and, although it may be said that his employment was for a mere temporary purpose, and that the plaintiff was not expecting any pay for the work done, and in that sense the employment was voluntary, still, being in the defendant's employment at the request of its servant or foreman, he was not a trespasser, and he was for the time being, the servant of the defendant, and entitled to the same protection as any other servant of the defendant."

The majority opinion holds that under the circumstances in the case at bar, "The same rule of liability applies as in the case of master and servant." The Chief Justice has concurred in that principle of law.

The trial court stated, in his memorandum opinion, as one of the alleged grounds for granting the new trial, that the plaintiff had not proven that he was free from contributory negligence, because he did not test the ladder before using it. Of course, as I have heretofore pointed out, and as Judge Christianson has shown in his opinion, the testimony clearly shows that he did make a test of the ladder before using it and Judge Nuessle states, in his opinion, "Before using the ladder, plaintiff tested it." He further states, "If the condition of the ladder was as discernible to him on such examination as a reasonably prudent person would give it before using it, as it was to any of the officers of the defendant, then there can be no liability for negligence on the defendant's part." . . . "The plaintiff was no zany." Of course, whether or not the condition of the ladder was as discernible to the plaintiff, on such examination as he would be expected to make under the circumstances (or a reasonably prudent man would give it before using it), as it was to any of the officers of the defendant corporation, was a question of fact, not to be determined by this court, or even the trial judge, but was a question of fact to be determined by the jury. The jury evidently determined that question of fact in favor of the plaintiff and it is not within the province of this court or the trial court to substitute its judgment for the judgment of the jury on that point, as that would be invading the province of the jury. Whether the plaintiff was a "zany" or was not a "zany" does not change the law applicable to the case. He did not assume the risk of injury caused by the master's negligence in furnishing him a defective ladder with knowledge that it was defective.

In the case of Finch v. W. R. Roach Company, 295 Mich 598, 295 NW 324, at page 327 the Supreme Court of Michigan, in a case which, by the way, involved a three legged step ladder only eight feet high, said:

(10–12). "We are much impressed with defendant's claim that, despite the verdict of the jury, *the tipping of the ladder resulted from the plaintiff's own carelessness, but we are constrained to hold that the issue was properly submitted to the jury. It is our province as judges to determine whether there is room for a verdict, and at this point our inquiry must end, even though as triers of the facts we would be impelled to reach a contrary conclusion. From the evidence of the experts that there was a latent defect in the construction of the ladder supplied plaintiff, we cannot say as a matter of law that the circumstances were such that the plaintiff was bound to anticipate or discover there was or might be any such defect in the short time he was to use the article.* At least there was room for the jury to find that the plaintiff exercised the degree of care required of him for his own safety. Etel v. Grub, 157 Wash 311, 288 P 931. The cases of Kelly v. Brown, 262 Mich 356, 247 NW 900 and Nichols v. Bush, 291 Mich 473, 289 NW 219, *do not support defendant's contention that plaintiff was contributorily negligent as a matter of law. In neither case was there any proof of negligence on the part of the defendant in supplying an improperly designed* or out of repair ladder. *Where there is such evidence of defendant's negligence, and the circumstances are such that the infirmities are not readily discernble, the question of the users contributory negligence may properly be submitted to the jury.*"

In passing, I desire to point out that the case of Nichols v. Bush, supra, is one of the main cases cited by Judge Morris in the majority opinion as supporting that opinion, which, under the evidence in this case, is not applicable.

In the case of Florence Bagg v. Otter Tail Power Co., 70 ND 704, 297 NW 774, this court, in an opinion by Judge Burr, concurred in by Chief Justice Nuessle and Justice Christianson held: Syllabus No. 3, "The defense of contributory negligence is an affirmative defense and presupposes negligence on the part of the defendant." The Court in that case said:

"But the problem in the case at bar is not as simple as ap-

pellant assumes it to be, for it assumes contributory negligence as a matter of law. The appellant proceeds on the theory the evidence shows conclusively that there was such contributory negligence on the part of plaintiff as precludes her recovery. This assumption, of course, admits negligence on the part of appellant, such negligence as would entitle plaintiff to recover unless her own negligence so contributed to the collision as to prevent her from recovering. The negligence of the defendant having been established, *it was the duty of the jury to scan carefully the actions of the plaintiff and see whether, under the law of the case and under the rules of common sense and common prudence, she could have avoided the accident.*" (citing many North Dakota cases.)

In view of the conclusions that I have reached in this case it is my opinion that the Order of the Trial Court should be reversed and the cause should be remanded with directions to reinstate the verdict and enter judgment in favor of the plaintiff.